**Eric PARR, Plaintiff,**

v.

**L & L DRIVE–INN RESTAURANT, et al., Defendants.**

**No. 97–00729 FIY.**

United States District Court, D. Hawaii.

May 16, 2000.

Lunsford D. Phillips, Honolulu, HI, for plaintiffs Eric Parr and Hank Emerick.

Ken T. Kuniyuki, Honolulu, HI, for defendant L & L Drive Inn.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

YAMASHITA, United States Magistrate Judge.

## I. *INTRODUCTION*

A. *Background and Procedural History*

On June 5, 1997, Plaintiff Eric Parr ("Plaintiff"), a disabled individual who requires a wheelchair to gain mobility, filed an action against Defendant L & L Drive–Inn Restaurant, d/b/a L & L Drive–Inn. ("Defendant" or "L & L"). In his Complaint, Plaintiff alleged that Defendant violated the provisions of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, by failing to remove architectural barriers to access. (*See* Complaint).

Plaintiff's counsel retained the services of USA Accessibility Consulting, Inc. ("UAC"). UAC's president, Brent Beals, conducted on-site surveys of Defendant's facility. Mr. Beals reported his findings in a written report containing photographs, measurements, and alleged ADA violations.

Defendant L & L is a public accommodation within the purview of the ADA. The facility is a fast food franchised restaurant.

Similar franchised L & L restaurants are located around the island of Oahu. Defendant is the owner/franchisee of the L & L restaurant at issue.

Eddie Flores, Jr., is the president of L & L Franchise, Inc., officer of the Defendant corporation and the designated "ADA compliance officer" for all the L & L franchisees. Mr. Flores retained the services of Accessibility Planning & Consulting, Inc. ("APC"). APC conducted on-site surveys of Defendant's facility and submitted barrier removal recommendations to Mr. Flores. Specifically, Mr. Flores worked closely with APC's president, Bruce Clark, and APC project manager, Robert Askew. Defendant asserts that it has complied with all the requirements of the ADA.

On October 23, 1998, Plaintiff filed a First Amended Complaint ("Amended Complaint"). The Amended Complaint added Defendants Irwin W.L. Tom and Dora T. Cheng and specifically alleged that, in violation of the ADA and 28 C.F.R. Part 36, Defendants failed to remove architectural barriers, including but not limited to: (1) no accessible entrances; (2) no accessible routes; (3) no accessible signage; (4) no accessible tables; and (5) no accessible parking. (Amended Complaint ¶ 6).

Pursuing this action as an individual, Plaintiff seeks injunctive relief, in the form of an order requiring full compliance with the ADA within 90 days; litigation costs, including reasonable expert and attorneys' fees; and other relief this Court deems proper. *Id.*

On July 6, 1999, the parties filed a Consent to Exercise Jurisdiction by a United States Magistrate Judge in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. Pursuant to this Consent and the Order of Reference filed by the United States District Judge Susan Oki Mollway, this Court has jurisdiction to adjudicate this case.

In the interests of judicial economy and by the agreement of the parties, this case

was set for trial with six other ADA cases.[1] This Court heard the seven trials concurrently. The trials commenced on November 3, 1999 and concluded on November 23, 1999. Lunsford D. Phillips represented Plaintiff and Ken T. Kuniyuki represented Defendant. At trial, the parties were instructed to indicate to the Court when evidence proffered was to be considered for an individual case rather than be considered for all seven cases. For the most part, the parties failed to so designate. Accordingly, this Court considers much of the presented evidence as evidence in each of the seven cases. Pursuant to this Court's order, the parties submitted their proposed Findings of Fact and Conclusions of Law and Final Written Arguments on January 14, 2000.[2] (Tr. 11/23/99 at 45).[3]

## B. The Americans with Disabilities Act

### 1. Legislative History

The Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. § 12101 et seq., was enacted on July 26, 1990. At the time of its enactment, some 43,000,000 Americans suffered from physical or mental disabilities. 42 U.S.C. § 12101(a)(1) (1995). Congress determined that society had isolated and segregated individuals with disabilities. 42 U.S.C. § 12101(a)(2). Discrimination against individuals with disabilities persisted in critical areas such as employment, housing, public accommodations, transportation, communication, education, recreation, institutionalization, health services, voting, and access to public services. 42 U.S.C. § 12101(a)(3).

The primary purpose of the ADA was to provide a "clear and comprehensive national mandate for the elimination of discrimination" with "clear, strong, consistent, enforceable standards" to address such discrimination. 42 U.S.C. § 12101(b)(1), (2).

The ADA provides individuals with disabilities "civil rights protections with respect to discrimination that are parallel to those provided to individuals on the basis of race, color, national origin, sex, and religion." 56 Fed.Reg. 35,545 (1991). Its principal elements were drawn from two key civil rights statutes, the Civil Rights Act of 1964 and Title V of the Rehabilitation Act of 1973. Id. The ADA employs the framework of both Acts for issues of coverage, enforcement, and terms and concepts for what constitutes discrimination. Id.

The scope of the Act covers not only intentional discrimination, but also the discriminatory effects of "benign neglect, apathy, and indifference." Helen L. v. DiDario, 46 F.3d 325, 335 (3rd Cir.1995) (internal quotations omitted). Discrimination could involve the active preclusion of employment based on one's disability; or passive limited access for wheelchair bound individuals. See Crowder v. Kitagawa, 81 F.3d 1480, 1483 (9th Cir.1996) (Congress intended ADA to cover discriminatory impact of facially neutral barriers).

### 2. Title III of the Americans with Disabilities Act

Congress divided the ADA into five sections: private sector employment under

1. The seven cases are: *Parr v. Liliha L & L*, Civ. No. 97–00729FIY; *Parr v. Waianae L & L*, Civ. No. 97–01177FIY; *Parr v. Kapahulu L & L*, Civ. No. 98–00329FIY; *Parr v. Pawaa L & L*, Civ. No. 97–01210FIY; *Emerick v. Kahala L & L*, Civ. No. 97–01174FIY; *Emerick v. Aikahi L & L*, Civ. No. 97–1189FIY; and *Emerick v. Kapiolani L & L*, Civ. No. 97–01172FIY. Throughout this document, this Court refers to the other L & L restaurants involved in the six other cases. To lessen confusion, this Court refers to each case by restaurant location.

This Court denied Defendant's Motion to Consolidate these seven cases on the basis that there was not substantial identity of issues and parties.

2. After the trial, on April 4, 2000, a Stipulation for Dismissal with Prejudice was filed as to Defendants Irwin W.L. Tom and Dora T. Cheng. Accordingly, L & L is the only remaining defendant.

3. Due to a delay in obtaining all of the trial transcripts, this Court delayed its ruling.

Title I; public programs and activities under Title II; public accommodations under Title III; telecommunications under Title IV; and miscellaneous provisions under Title V. Americans with Disabilities Act of 1990, Pub.L. No. 101–336, 104 Stat. 327 (1990).

The provisions of Title III are at issue in this case. Title III of the ADA prohibits discrimination against disabled[4] individuals in any place of public accommodation.[5] 42 U.S.C. § 12182. Here, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a). Liability is imposed upon "any person who owns, leases (or leases to), or operates a place of public accommodation" that discriminates against an individual on the basis of disability. *Id.*

Discrimination includes the failure to remove "architectural barriers" in existing facilities where such removal is "readily achievable."[6] 42 U.S.C. § 12182(b)(2)(A)(iv). Where an entity can demonstrate that the removal of a barrier is not readily achievable, discrimination also includes failure to make such facilities available through alternative methods if such methods are readily available. 42 U.S.C. § 12182(b)(2)(A)(v). However, no entity shall be required to permit disabled individuals to participate in or benefit from public accommodations where such an individual poses a direct threat to the health and safety of others. 42 U.S.C. § 12182(b)(3).

### 3. Causes of Action for Architectural Barriers in Public Accommodations

Congress considered the importance of ensuring that small businesses and the ADA were compatible. *See* Hearing on S. 933 Before Committee on Small Business, 101st Legis., 2d Reg.Sess. (1990). To strike a balance between the interests of the disabled and the legitimate concerns of private businesses, the ADA delayed its effective date to "permit adequate time for businesses to become acquainted with the ADA's requirements and to take the necessary steps to achieve compliance."[7] Statement on Signing the Americans with Disabilities Act of 1990 at 2 (July 26, 1990) ("Statement on Signing"). Further, the ADA was crafted to "give the business community the flexibility to meet the requirements of the Act without incurring undue costs." *Id.* at 1–2. The modest requirement of "readily achievable" barrier removal on existing facilities "allows for minimal investment with a potential return of profit from use of disabled patrons, often more than justifying the small expense." S.Rep. No. 101–116, at 66 (1989).[8]

If a place of public accommodation fails to remove architectural barriers, the enforcement provisions of the ADA provides

---

4. The ADA defines "disability" to mean, with respect to an individual: a physical or mental impairment that substantially limits one or more of the major life activities of such individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(2).

5. Public accommodations under Title III include: restaurants, hotels, doctor's offices, pharmacies, grocery stores, shopping centers, and other similar establishments. *See* 42 U.S.C. § 12181(7).

6. The term "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9).

7. For example, the provisions of Title III went into effect 18 months after the date of enactment. 56 Fed.Reg. 35,544 (1991).

8. To encourage barrier removal, other federal agencies promulgated their own provisions. For example, the Internal Revenue Code provides tax benefits to businesses that incur expenses for the removal of architectural barriers. 26 U.S.C. § 44 (1999); 26 U.S.C. § 190 (1999). Small businesses are eligible for tax credit equal to 50% of the costs for "removing architectural . . . barriers which prevent a business from being accessible to, or usable by, individuals with disabilities." 26 U.S.C. § 44(a), (c)(2)(A). Such a tax credit only applies to expenditures of a taxable year that exceed $250 but not more than $10,250. 26 U.S.C. § 44(a).

a private right of action. 42 U.S.C. § 12188(a)(1). A private action under Title III is available to any person who is "being subjected to discrimination on the basis of disability" or who has "reasonable grounds for believing that such person is about to be subjected to discrimination...."[9] 42 U.S.C. § 12188(a)(1). The ADA does not require "a person with a disability to engage in a futile gesture if such [a] person has actual notice that a person or organization ... does not intend to comply" with the ADA. *Id.*

Title III incorporates the remedies and procedures of Title II of the Civil Rights Act of 1964. *See* 42 U.S.C. § 12188(a)(1). The court may order injunctive relief which includes an order to make a facility "readily accessible." 42 U.S.C. § 12188(a)(2). Or, where appropriate, injunctive relief may include "requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods...." *Id.*

A civil action under Title III could also be brought by the Attorney General. 42 U.S.C. § 12188(b). The Attorney General has a duty to investigate alleged violations of the ADA and undertake periodic reviews of covered entities. 42 U.S.C. § 12188(b)(1)(A). The Attorney General can bring a civil action in federal court if "the Attorney General has reasonable cause to believe that ... any person or group of persons has been discriminated against ... and such discrimination raises an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B)(i)–(ii). In addition to injunctive relief, the court may award "monetary damages to persons aggrieved when requested by the Attorney General." 42 U.S.C. § 12188(b)(2)(B). When considering the amount of a civil penalty, the court shall give consideration to "any good faith effort or attempt to comply with this chapter...." 42 U.S.C. § 12188(b)(5).

With that introductory background, this Court moves to the merits of this case. Having considered the legislative history behind the ADA, the applicable ADA provisions, constitutional limitations, the arguments of counsel, the evidence and testimony presented at trial, and for the reasons set forth below, this Court now enters the following Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").[10] *See* Fed.R.Civ.P. 52(a). To the extent any of the Findings as stated may also be deemed to be Conclusions, they shall also be considered Conclusions. In the same way, to the extent any of the Conclusions as stated may be deemed to be Findings, they shall also be considered Findings. *See Miller v. Fenton,* 474 U.S. 104, 114–15, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

## II. FINDINGS OF FACT

### A. The Parties and Their Claims

Plaintiff Parr is permanently disabled due to a closed head injury. (Tr. 11/03/99, vol. I, at 6). Plaintiff suffers from quadriplegia and is bound to a wheelchair. Plaintiff has been disabled for the past 28 years. *Id.* The architectural barriers that are possibly relevant to the disability of Plaintiff have to do with mobility, i.e. wheelchair access.

Plaintiff has lived in Hawaii since 1981 and currently resides in the Kakaako area of Honolulu. *Id.* at 6, 9. Plaintiff uses the public bus service for transportation across the island of Oahu. *Id.* at 9.

The Liliha L & L is located at 1711 Liliha, Honolulu, Hawaii 96717. Plaintiff visited L & L one time. (Tr. 11/03/99, vol. I, at 19). During that visit, Plaintiff encountered a high entrance threshold, an entrance through the driveway, a ramp that was sloped incorrectly, and tables that

9. The ADA allows a person to sue on behalf of a disabled individual upon "reasonable grounds" that said disabled individual will be subjected to discrimination only if the violation is related to "new construction and alterations." *See* 42 U.S.C. § 12183.

10. The following Findings of Fact and Conclusions of Law are in paragraph format rather than the usual numbered format. This format suits the content and organization of this Court's ruling.

were too low. *Id.* at 19–20. Plaintiff filed this action on June 5, 1997.

Plaintiff has visited at least six to seven L & L restaurants, including Defendant's, to see if they were in compliance with the ADA and to order chicken katsu.[11] (Tr. 11/03/99, vol. I, at 40). Plaintiff testified that he seeks full compliance of the ADA on behalf of himself and other disabled individuals. *Id.* at 8.

## B. *ADA Compliance*

Brent Beals, the President of USA Accessibility Consulting, Inc., was retained by Plaintiff's counsel for consultation on this case. (Tr. 11/03/99, vol. II, at 6; Pl.'s Exh. 1). Mr. Beals has been a full time ADA consultant for the past 5 years. (Tr. 11/03/99, vol. II, at 7). Mr. Beals previously held a contractor's license. *Id.* at 10. The court qualified Mr. Beals as an expert in the limited area of barrier identification and the cost of remediation. *Id.* at 18.

Mr. Beals performed an on-site inspection of L & L on August 23, 1997. (Pl.'s Exh. 4). He reported his findings in a survey report containing photographs and measurements with references to the applicable ADA provisions. *Id.* At trial, Mr. Beals testified to the significant barriers identified and contained in the August 1997 report. (Tr. 11/03/99, vol. II, at 34–37). Defendant received a copy of the August 1997 report before the trial. (Tr. 11/04/99 at 3–4). Subsequently, Mr. Beals inspected all the L & L's in March 1998, October 1998, November 1999, and February 1999. (Tr. 11/16/99 at 148).

Eddie Flores, Jr., is the President of L & L Franchise, Inc. (Tr. 11/16/99 at 22). Mr. Flores takes care of the operational and administrative areas of most of the franchised L & L restaurants. *Id.* Mr. Flores also negotiates the leases for all the L & L restaurants. *Id.* at 32. When a franchised L & L corporation is formed, Mr. Flores usually becomes the secretary for said corporation. *Id.* at 22.

Mr. Flores is an officer of Defendant's corporation. *Id.* Mr. Flores is also the "ADA compliance officer" for all the franchised L & L restaurants. *Id.* In March of 1997, Mr. Flores discovered that the Waipio Gentry L & L was being sued for violating the ADA. *Id.* at 23. Mr. Flores sent out memoranda to the other L & L franchisees, on May 1, 1997, warning them that the Waipio Gentry L & L had been sued and compliance with the ADA is mandatory. (Def.'s Exh. 131).

In April 1997, Mr. Flores purchased 60 "ADA signs" to be mounted in the various L & L restaurants. (Def.'s Exh. 130). In May 1997, Mr. Flores also purchased 20 "ADA booths" to be installed in the various L & L restaurants. (Def.'s Exhs. 132–133, 135, 144).

In August 1997, Mr. Flores sent an "urgent" memorandum to all the L & L restaurants warning them to comply with the ADA because "a lawyer is sending disabled people to some of the L & L locations so he can sue you." (Def.'s Exh. 145).

On January 13, 1998, Mr. Flores informed the various L & L landlords/lessors that they may be in violation of the Americans with Disabilities Act as to the common areas of their facilities. (Def.'s Exhs. 154–157).

Mr. Flores also retained the professional services of an ADA consulting firm. (Tr. 11/16/99 at 25). After the lawsuit against the Waipio Gentry L & L was filed, Mr. Flores first contacted Accessibility Planning & Consulting, Inc. ("APC"). (Tr. 11/15/99 at 144). Bruce Clark is the President of APC. (Def.'s Exh. 105). Mr. Clark has approximately 12 years of experience in the area of accessible design standards and laws under the ADA. (Tr. 11/15/99 at 101). The court qualified Mr. Clark as an expert on ADA accessibility. (Tr. 11/15/99 at 105).

Robert Askew is a project manager for APC. (Tr. 11/15/99 at 120). Mr. Askew's

---

11. Chicken katsu is a well-known local entree of deep fried breaded chicken cutlets served with sweet/tangy dipping sauce.

principal duty is to perform barrier identification surveys. (Tr. 11/04/99 at 130). In his supervisory capacity, Bruce Clark reviewed the results of Mr. Askew's barrier investigations. (Tr. 11/15/99 at 4, 6). The court qualified Mr. Askew as an expert in the limited area of barrier identification. (Tr. 11/04/99 at 119–120).

On April 1, 1997, APC submitted a proposal to Mr. Flores for an on-site survey of 24 L & L restaurants which included the production of a report outlining the identification of barriers and estimated costs for any required removal. (Def.'s Exh. 107). APC offered those services for a total cost of $7,743.70. *Id.* Mr. Flores rejected the proposal because of the high price and the inclusion of certain L & L locations. (Tr. 11/04/99 at 133).

On June 10, 1997, APC submitted another proposal to Mr. Flores for an on-site survey of the Liliha L & L and four other locations. (Pl.'s Exh. 96). This proposal was partially accepted as to the Liliha L & L only. *Id.* The survey was performed by APC surveyor Robert Askew. (Tr. 11/04/99 at 169). APC provided Mr. Flores with a survey report and recommendations for the Liliha L & L. (*See* Def.'s Exh. 108).

On August 29, 1997, APC submitted another proposal to Mr. Flores for ADA consultation at a set rate of $80 an hour on an "as needed" basis for the other L & L restaurants. (Def.'s Exh. 112). Mr. Flores accepted the proposal. (Tr. 11/15/99 at 152–53).

In accordance with the proposal, on September 3, 1997, Mr. Askew and Mr. Flores surveyed 18 other L & L restaurants. (Tr. 11/04/99 at 126–27). Mr. Askew did a walk through of each establishment relating his concerns and opinions to Mr. Flores, while Mr. Flores took notes. *Id.* These 18 surveys took a total of six and a half hours, or about 20 minutes per location, inclusive of travel time to sites scattered virtually over the length and breadth of the island of Oahu. (Tr. 11/04/99 at 127, 136; Tr. 11/16/99 at 87). APC was not contracted to provide full written reports for any of the L & L restaurants with the exception of the Liliha L & L. (Tr. 11/15/99 at 151–152).

On October 7, 1997, Mr. Askew surveyed all the L & L restaurants at issue with the exception of the Liliha L & L. (Tr. 11/04/99 at 133). The purpose was to "ensure that the barriers had been removed at the sites that [were] previously surveyed." *Id.* at 124.

On January 13, 1998, APC represented that, upon the review of Plaintiff's barrier reports, L & L was in compliance with the ADA to the maximum extent feasible. (Tr. 11/15/99 at 121; Def.'s Exh. 120).

On April 4, 1998, Mr. Clark surveyed all the L & L restaurants at issue; thereafter, on October 29, 1999, Mr. Askew surveyed said L & L restaurants again. (Tr. 11/04/99 at 128–129; Tr. 11/15/99 at 11).

## C. *Credibility*

These seven cases represent the current tension between private disabled plaintiffs and the attempts by small businesses to deal with the ADA. Throughout the course of this trial, lack of candor and representations beyond the scope of all reason compelled this Court to deal with the issue of credibility. Unfortunately, this lack of credibility had a significant impact on this Court's findings of fact. This Court's analysis on credibility takes into account all the testimony presented in all seven cases because said testimony bears on credibility and none of the parties otherwise limited such use of the evidence.

This Court begins with Plaintiff's expert, Brent Beals. Defendant attacked the credibility of Mr. Beals on grounds of his competence and ability as an ADA expert, his relationship with attorney Lunsford Phillips,[12] and his prior criminal conviction

---

12. Defendant noted that Mr. Phillips represented Mr. Beals in an unrelated civil action, and alleged that Mr. Phillips encouraged Mr. Beals to become an ADA consultant. (Tr. 11/03/99, vol. II, at 13, 16). Also, Mr. Beals helped Mr. Phillips renovate his house and stayed over on several occasions. *Id.* at 13.

in California. (Tr. 11/03/99, vol. II, at 10–17). These attacks are of no import to this Court in the determination of the relevant facts herein. This Court qualified Mr. Beals as an expert in the limited area of taking measurements and approximating the costs of barrier removal. *Id.* at 18–19. These types of opinions are easily ascertainable and subject to common logic. When so measured, this Court finds the testimony of Brent Beals to be credible.

Defendant's expert Bruce Clark clearly has the best credentials as an expert on ADA compliance. However, this Court still questions his credibility. For example, Mr. Clark testified that restaurant sales counters do not have a maximum height requirement under the ADA. (Tr. 11/15/99 at 124, 161). This testimony is in direct conflict with prior APC survey reports. On July 8, 1997, Mr. Clark submitted a written report to Mr. Flores recommending that the Liliha L & L provide at least one sales counter that is "no higher than 36 [inches]. . . .". (Def.'s Exh. 108 at 2). On October 8, 1997, APC project manager Robert Askew also submitted a written report stating that the Waianae L & L sales counter "will be lowered to the correct height of 36 [inches] above finished floor." (Def.'s Exh. 118). Interestingly, Mr. Clark testified that he would "always sit and discuss" such survey reports with Mr. Aschew. (Tr. 11/15/99 at 120).

Defendant's other expert, Robert Askew, made the most significant misrepresentation to this Court. Mr. Askew admitted that he lied to this Court under oath. On direct examination, Mr. Askew testified that on October 7, 1997, the accessible parking space and access aisle at the Waianae L & L was in compliance with the ADA. (Tr. 11/04/99 at 142–43; Tr. 11/15/99 at 33).

Prior to trial, however, Mr. Askew knew that the accessible parking area was not in compliance with the ADA on October 7, 1997. Only about one week before trial, on October 29, 1999, was the accessible parking space and access aisle restriped and widened to comply with the ADA. (Tr. 11/15/99 at 34–35; *see* Def.'s Exhs. 121D, 121H). Not only did Mr. Askew visit the Waianae L & L on that day, he was present when the parking area was restriped and widened. (Tr. 11/15/99 at 34). Indeed, testimony of Mr. Flores also implied that it was Mr. Askew who ordered the Waianae L & L to repaint the parking area. (Tr. 11/23/99 at 39–40). When confronted on cross examination with photographs he personally took of the parking area that day, Mr. Askew admitted that he lied under oath to this Court to cover up the fact that the October 7, 1997 assessments by APC were incorrect. (Tr. 11/15/99 at 35).

Finally, this Court ends its section on credibility with Eddie Flores, Jr. Mr. Flores stated that upon notification of any ADA non-compliance, the L & L's "complied right away." (Tr. 11/16/99 at 42–43). In fact, Mr. Flores testified that any perceived violation would be removed that "same day." *Id.* at 43. However, this Court could not reconcile Mr. Flores' professed good faith and vigorous efforts to comply with the ADA with his utter lack of candor.

Mr. Flores broadly asserted that most of the L & L's have been in full compliance since September 3, 1997, except for "some minor adjustment[s]." (Tr. 11/16/99 at 94). His own testimony negates this assertion. Mr. Flores admitted that he knew the parking lot of the Waianae L & L was not ADA compliant until just before trial. (Tr. 11/23/99 at 39–40). Despite Mr. Flores' avowed diligence in fixing ADA violations, Mr. Flores' conceded that this problem existed from February 1998 to October 1999. *Id.* at 37–38. When asked why he did not notice this problem during this 20 month period, Mr. Flores answered, "I may not be out there during that period." *Id.* at 38. After further cross examination, Mr. Flores soon confessed that he did in fact visit the Waianae L & L within the relevant period. (Tr. 11/23/99 at 39).

Mr. Flores knew that a pay phone at the Liliha L & L was not ADA compliant. His

solution was to direct that the pay phone be shut off. (Tr. 11/16/99 at 108). On cross examination, he insisted that the pay phone had been rendered inoperative, covered with a bag, and marked "out of order." *Id.* at 108–109. Plaintiff's counsel then introduced a photograph, showing the pay phone uncovered, unsigned, and in use by a patron. (Tr. 11/16/99 at 110; *see* Pl.'s Exh. 205). Thereafter, Mr. Flores could not refute that the pay phone may have been operable a day or two before trial. (Tr. 11/16/99 at 110).

Mr. Flores' assertions regarding the "ADA tables" were questionable. These ADA tables were in fact "too low and too narrow." (Tr. 11/16/99 at 123). Mr. Flores testified that he noticed the potential height problem without the aid of an expert and had extensions welded to the tables to correct the problem. (Tr. 11/16/99 at 116–117; *see* Pl.'s Exh. 61). In addition, with some assistance, Mr. Flores also determined that some of the table legs had to be moved. (Tr. 11/16/99 at 118–119; *see* Pl.'s Exh. 27, 35, 74). Thus, Mr. Flores purchased ADA tables, decided to check if they were ADA compliant, discovered that the tables were not ADA compliant, removed them from the various restaurants, fixed the detected problems, and reinstalled the tables. (Tr. 11/16/99 at 116–117). Mr. Flores contends that all this occurred after he received the tables in mid-August 1997 and before APC's September 3, 1997 surveys. *Id.* at 51, 117–119. Mr. Flores could not provide dated receipts which would document the labor for these corrections. *Id.* at 51, 117–118.

Similarly, Mr. Flores asserts that the wooden Kapahulu L & L table was purchased and its legs were extended sometime between August 23, 1997 and September 3, 1997. (Tr. 11/16/99 at 128). These extensions were wooden blocks that were connected to the bottom of the table's legs. (*See* Pl.'s Exh. 53). Mr. Flores adamantly testified that the extensions had been in place for over two years. (Tr. 11/16/99 at 128–129). Upon the review of photographs, it is clear that the extensions were recently added. In comparison to the table legs, the extensions had absolutely no discoloration or scuff marks from day to day use. (*See* Pl.'s Exhs. 53–55). Moreover, a bright yellow price tag was still affixed to the bracket that secures the extension for one of the table legs. *Id.* at 55. Based upon these findings, this Court is unable to give credence to any of Mr. Flores' testimony.

## III. CONCLUSIONS OF LAW

In addition to the general issues regarding ADA compliance, this Court also addresses the following issues: (1) notice to the state authority requirements; (2) constitutional and prudential standing requirements; (3) alleged ADA violations not asserted in Plaintiff's Amended Complaint; (4) Defendant's attempts to comply with the ADA or reliance in the representations of others; and (5) alleged ADA violations which have been remediated to the satisfaction of Plaintiff.

### A. *Jurisdiction*

This Court finds that it has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

#### 1. *Notice to State Authority*

Defendant contends that this Court lacks subject matter jurisdiction over Plaintiff's ADA claims because Plaintiff failed to comply with the federal administrative procedure of "notice" to the state authority before filing this suit. *See* 42 U.S.C. § 2000a–3(c).

The enforcement provisions of the ADA provides in pertinent part:

> The remedies and procedures set forth in section *2000a–3(a)* of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter....

42 U.S.C. § 12188(a)(1) (emphasis added).

42 U.S.C. § 2000a–3(a) as part of Title VII, provides in pertinent part:

Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a–2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved....

*Id.*

Title VII actions brought under § 2000a–3(a) are limited by the notice requirement of 42 U.S.C. § 2000a–3(c) that provides:

In the case of an alleged act or practice prohibited by this subchapter which occurs in a State, ... which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, *no civil action may be brought under subsection (a) of this section before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority* by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

*Id.* (emphasis added).

Defendant argues that just as Title VII discrimination actions brought pursuant to § 2000a–3(a) must exhaust administrative procedures, so must actions brought under the ADA. Defendant cites to the Hawaii laws addressing discrimination against disabled individuals.[13] These laws prohibit discrimination on the basis of disability in public accommodations in Hawaii and also authorize the Civil Rights Commission to grant or seek relief from discriminatory practices against disabled individuals. Therefore, Defendant contends that Plaintiff must comply with the state notice pro-

cedure § 2000a–3(c), in order to bring this civil enforcement action under the ADA.

Federal courts have been evenly split on this issue of whether ADA plaintiffs are required to comply with § 2000a–3(c). The Ninth Circuit has yet to rule on this issue.

Some courts have concluded that in order to sue under Title III of the ADA, plaintiffs must have exhausted all administrative avenues. *Howard v. Cherry Hills Cutters Inc.*, 935 F.Supp. 1148 (D.Colo. 1996); *Daigle v. Friendly Ice Cream Corp.*, 957 F.Supp. 8 (D.N.H.1997); *Snyder v. San Diego Flowers*, 21 F.Supp.2d 1207, 1210 (S.D.Cal.1998) ("Although reasonable judges could reach different results on this question ... 42 U.S.C. section 12188(a) does incorporate the requirements of 42 U.S.C. section 2000a–3(c) for civil actions under the ADA."); *Mayes v. Allison*, 983 F.Supp. 923, 925 (D.Nev.1997) ("In keeping with legislative intent ... section 2000a–3(c) applies to actions brought to enforce 42 U.S.C. § 12182.").

Other courts have concluded that the statute is clear and unambiguous and therefore § 2000a–3(c) is not included in Title III. *Guzman v. Denny's Inc.*, 40 F.Supp.2d 930, 934 (S.D.Ohio 1999) ("To hold that the entirety of § 2000a–3 is adopted is to impermissibly render superfluous the explicit textual reference to § 2000a–3(a)."); *Moyer v. Showboat Casino Hotel*, 56 F.Supp.2d 498, 501 (D.N.J. 1999) ("This Court finds that the language of 42 U.S.C. § 12188 is clear and unambiguous and should be given its plain meaning."); *Botosan v. Fitzhugh*, 13 F.Supp.2d 1047 (S.D.Cal.1998) (concluding that paragraph 2000a–3(c) was not included based on legislative history); *Soignier v. American Bd. of Plastic Surgery*, No. 95C 2736, 1996 WL 6553 (N.D.Ill. Jan.8, 1996).

█ This Court finds that 42 U.S.C. § 12188(a) does not incorporate 42 U.S.C. § 2000a–3(c) for civil actions under the ADA. Attempts at statutory construction

---

**13.** Hawaii Revised Statutes ("HRS") §§ 489– 1(a), 489–3, 489–6, 368–1, and 368–11.

must start with the plain language of the text itself. *See Vergos v. Gregg's Enterprises, Inc.*, 159 F.3d 989, 990 (6th Cir. 1998). "Canons of statutory construction dictate that if the language of a statute is clear, we look no further than that language in determining the statute's meaning." *United States v. Lewis*, 67 F.3d 225, 228 (9th Cir.1995) (citations omitted).

▮ The ADA expressly incorporates paragraph (a) only. There is no mention of the rest of section 2000a–3. Thus, under the accepted practices of statutory construction, this Court concludes that Congress did not intend to incorporate section 2000a–3(c) into the statute. As the *Moyer* court explained, " '[t]he canon of *expressio unius est exclusio alterius* means that explicit mention of one thing in a statute implies a congressional intent to exclude similar things that were not specifically mentioned.' " 56 F.Supp.2d at 502 (*quoting Collinsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 232 (3d Cir.1998)). Accordingly, this Court finds and concludes that 42 U.S.C. § 2000a–3(c) is not incorporated into the ADA, and therefore, this Court has subject matter jurisdiction over this case.

### 2. Standing

▮ Defendant contends that Plaintiff lacks the "jurisdictional prerequisite" of standing. *See In Re Parmetex, Inc.*, 199 F.3d 1029, 1030 (9th Cir.1999) (quotation omitted). Federal courts are required to "examine sua sponte jurisdictional issues such as standing." *B.C. v. Plumas Unified School District*, 192 F.3d 1260, 1264 (9th Cir.1999) (citation omitted).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The constitutional minimum limits the judicial power of the federal courts to "cases" or "controversies." U.S. Const. art. III, § 2. The doctrines which have developed to elaborate the case or controversy requirement are "founded in concern about the proper-and properly limited-role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197 (citations omitted).

▮ The doctrine of standing is made up of constitutional and prudential considerations. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The prudential component of standing embraces:

> [J]udicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Allen*, 468 U.S. at 751, 104 S.Ct. 3315 (citation omitted).

▮ The core component of standing, however, is "derived directly from the Constitution." *Id.* The Supreme Court has developed a three-part test for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, the plaintiff must have suffered an "injury in fact." This consists of an invasion of a legally—protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct serving as the basis of the lawsuit. In other words, the injury has to be fairly traceable to the challenged action of the defendant and not the result of the conduct of a third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* (quotations omitted). The plaintiff invoking federal jurisdiction has the burden of satisfying these elements. *Id.* at 561, 112 S.Ct. 2130 (citations omitted).

In *Lujan,* a plaintiff environmental group challenged a rule that limited § 7 of the Endangered Species Act of 1973 to actions within the United States or on the high seas. *Lujan,* 504 U.S. at 557–58, 112 S.Ct. 2130. The plaintiff sought an injunction requiring the Secretary of the Interior to promulgate a new regulation. *Id.* at 559, 112 S.Ct. 2130. The United States Supreme Court held that the group lacked standing. *Id.* at 578, 112 S.Ct. 2130. The environmental group's claimed injury was their inability to consult on certain matters abroad, and as a result, an increased rate of endangered species. *Id.* at 562, 112 S.Ct. 2130. The court found a cognizable interest based on the group's desire to observe an animal species. *Id.* at 563, 112 S.Ct. 2130. The court also required, however, that the environmental group be "among the injured." *Id.* at 563, 112 S.Ct. 2130.

To establish an injury in fact, the environmental group submitted the affidavits of two of its members. *Id.* Both affiants described their past experiences of observing endangered species in Egypt and Sri Lanka, and stated their intent to return. *Id.* at 563–64, 112 S.Ct. 2130. The court held that the affiants "intent" to return was not sufficient to establish an "actual or imminent" injury. *Id.* at 564, 112 S.Ct. 2130. The court stated that "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the someday will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*

In addition, the equitable remedy of injunctive relief is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (quotation omitted). " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unac-companied by any continuing, present adverse effects.'" *Lyons,* 461 U.S. at 102, 103 S.Ct. 1660 (quotation omitted).

In this case, Plaintiff argues that the broad language of the ADA confers standing to sue for prospective injunctive relief for barriers he encountered, for barriers he did not encounter, and for barriers unrelated to his disability. *See Trafficante v. Metropolitan Life Insurance Company,* 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) ("We can give vitality to [the statute] only by a generous construction which gives standing to sue . . . ."). On the other hand, Defendant argues that Article III of the United States Constitution limits standing to "cases or controversies." *See Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Here, Defendants contend that Plaintiff has failed to establish constitutional standing under the three-prong *Lujan* test and that prudential limitations preclude Plaintiff from asserting the rights of third parties.

Examining the language and policy of the ADA, this Court finds that Plaintiff has standing on all counts. Because a private action under the ADA may provide "injunctive relief . . . to make [ ] facilities readily accessible to and usable by individuals with disabilities," it seems that relief includes total compliance with the ADA. 42 U.S.C. § 12188(a)(2). However, this Court is strictly limited to the "irreducible constitutional minimum of standing." *Doe v. National Board of Medical Examiners,* 199 F.3d 146, 152 (3rd Cir.1999) (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). [A]lthough "Congress may expand the definition of what constitutes an injury, essentially by expanding the list of rights people enjoy, it may not eliminate the constitutional 'case or controversy' requirement." *Hoepfl v. Barlow,* 906 F.Supp. 317, 323 (E.D.Va.1995) (finding no standing to sue for injunctive relief under the ADA). The "proper analysis of standing focuses on whether the plaintiff suffered an actual injury, not on whether a statute was violat-

ed." *National Board of Medical Examiners,* 199 F.3d at 153. Accordingly, statutorily created rights under the ADA must still rise to a "case or controversy." This Court now applies the three-prong *Lujan* test as to architectural barriers Plaintiff alleges he encountered at L & L. Thereafter, this Court makes determinations as to whether standing extends to barriers not encountered by Plaintiff and barriers not related to Plaintiff's disability.

### a. *Injury in Fact*

Plaintiff alleges that, in violation of the ADA's provisions, he was denied access to Defendant's restaurant due to Defendant's discriminatory failure to remove architectural barriers. An alleged violation of the ADA is an injury sufficient to give rise to an Article III case or controversy. *Aikins v. St. Helena Hosp.,* 843 F.Supp. 1329, 1334 (N.D.Cal.1994). This Court finds that the identified injury is personal to Plaintiff, not theoretical or speculative. The injury is based in reality. Plaintiff's desire to patronize Defendant's restaurant free from discrimination is clearly a cognizable interest for purposes of standing. *See Hoepfl,* 906 F.Supp. at 322 ("[T]he right created and at issue here is the right to be free from discrimination in the enjoyment of public accommodations and services."); *see also National Board of Medical Examiners,* 199 F.3d at 153 (plaintiff's fear of discrimination due to identification of his disability was a concrete injury). Accordingly, this Court finds that Plaintiff has suffered a concrete injury.

■ Plaintiff must also prove that his injury is actual or imminent. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Although a single act of past discrimination may be sufficient to establish standing to bring an action under the ADA, plaintiffs "who seek *injunctive relief* must ... demonstrate that they themselves face a real and immediate threat of future harm." *Delil v. El Torito Restaurants, Inc.,* No. C 94–3900–CAL, 1997 WL 714866, at *4 (N.D.Cal. June 24, 1997) (emphasis added). ADA plaintiffs who seek prospective injunctive relief when they allege only past discrimi-

nation that is unlikely to be repeated have been denied constitutional standing. *Hoepfl,* 906 F.Supp. at 323; *Aikins,* 843 F.Supp. 1329, 1334. Courts have noted, however, that concrete plans to return, as exhibited by a hotel reservation or an airplane ticket, could demonstrate an "actual or imminent" injury. *Lujan,* 504 U.S. at 579, 112 S.Ct. 2130 (Kennedy, J., concurring); *Martin v. Hyatt Corporation,* Civ. No. 97–00209SOM, at 7 (D.Haw.1999).

■ This case involves one fast food restaurant that is associated with a chain of similar franchised restaurants. Visiting a fast food restaurant, as opposed to a hotel or professional office, is not the sort of event that requires advance planning or the need for a reservation. Fast food restaurants like L & L do not take reservations. Therefore, in contrast to the above cited cases, specification as to a date and time of returning to this public accommodation is impossible due to the nature of the event. Fast food patrons visit such restaurants at the spur of the moment. Once a person determines that he or she likes a fast food restaurant, that person's return is on impulse.

Plaintiff has developed a taste for L & L's food and has visited various L & L restaurants across the island of Oahu. In particular, Plaintiff intends to visit the Liliha L & L in the future. The record, however, indicates that Plaintiff visited this L & L only one time. Lacking a history of past patronage seems to negate the possibility of future injury at this particular location.

Of the seven cases presently before this Court, the facts of this case clearly presents the closest question of Article III standing. Reasonable courts could reach different results. This Court, however, finds that the scale tips in Plaintiff's favor. Plaintiff's past patronage at other franchised L & L restaurants supports a reasonable likelihood of future injury. *See Delil,* 1997 WL 714866, at *4 (past visits to restaurant may support claim to sue for

injunctive relief under ADA).[14] Because the other L & L franchised restaurants provide similar food and service, the only issue to consider is whether the Liliha location supports Plaintiff's intent to return. The Liliha L & L is located in the Honolulu area, within a reasonable distance from Plaintiff's residence and along a familiar bus route. (Tr. 11/03/99, vol. I, at 35). Moreover, this Court is satisfied that Plaintiff's intent to return is sincere. Under the totality of the circumstances,[15] this Court finds that Plaintiff has established a likelihood of future injury based on his reasonable desire to patronize L & L in the future.

If this Court rules otherwise, like defendants would always be able to avoid enforcement of the ADA. This Court is "reluctant to embrace a rule of standing that would allow an alleged wrongdoer to evade the court's jurisdiction so long as he does not injure the same person twice." *Independent Living Resources v. Oregon Arena Corporation*, 982 F.Supp. 698, 702 (D.Or.1997) ("Independent I"). The provisions of the ADA would go unenforced, the alleged unlawful conduct would persist, and Defendant would not be held accountable.[16] *Cf. Lyons*, 461 U.S. at 112–13, 103 S.Ct. 1660 (due to possible remedy for

damages under § 1983, "withholding injunctive relief does not mean that the federal law will exercise no deterrent effect in these circumstances"). Accordingly, this Court finds that the facts of this case warrants the finding of an "actual or imminent" injury.

Based on Plaintiff's past visits to L & L restaurants, Plaintiff's intent to return, and in light of Congress' decision to allow the private enforcement of the ADA, this Court concludes that Plaintiff has satisfied the first prong of the *Lujan* test.

### b. *Causation*

If the plaintiff is himself the object of the action, "there is ordinarily little question that the action or inaction [of the defendant] has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. In this case, Plaintiff is the object of this action. Plaintiff has alleged a direct injury as a result of the existence of architectural barriers. This injury is fairly traceable to the actions or inaction of Defendant because said injury occurred in a public accommodation under Defendant's operation and control. Accordingly, the causation element of the *Lujan* test has been satisfied.

14. In *Delil v. El Torito Restaurants, Inc.*, a wheelchair bound plaintiff claimed that she was denied access to defendant's restaurant because the wheelchair lift used to access the lower dining area was locked and she was not allowed to operate the lift herself. 1997 WL 714866, at *1. The court found that the plaintiff lacked standing to sue for injunctive relief. *Id.* at * 4. The court reasoned that plaintiff failed to demonstrate a real and immediate threat of future harm because not only did she live in Sacramento, over 100 miles away from the Monterey restaurant, she also did not attempt to visit the restaurant since the incident of discrimination or allege that she planned to return. *Id.* at *4. The *Delil* court also explained that, in terms of discrimination that occurred in the past, the ADA authorizes the Attorney General to seek relief on behalf of the disabled. *Id.* at * 5. The Attorney General may bring a civil action "[i]f the Attorney General has reasonable cause to believe that ... any person or group of persons has been discriminated against ... and such

discrimination raises an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B). The court noted, however, that "[a] Monterey resident [as opposed to a Sacramento resident] who frequently visited the restaurant might bring a claim for injunctive relief under the ADA." 1997 WL 714866, at *4.

15. This Court limits its ruling to the unique facts of this case. As a result, this Court's analysis may not apply to other public accommodations in which the nature of visitation differs.

16. One could argue that individual standing should be denied in this instance because 42 U.S.C. § 12188(b)(1)(B) permits the Attorney General to bring a civil suit. *Id.* If so, private enforcement of the ADA would be rendered meaningless. It makes little sense to limit Plaintiff's ability to bring this action when, as discussed above, the elements of constitutional standing have been reasonably met.

### c. Redressability

Plaintiff seeks injunctive relief against Defendant for the alleged discrimination he encountered due to architectural barriers. If successful, injunctive relief would include "an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities...." 42 U.S.C. § 12188(a)(2). A favorable decision would clearly redress the alleged injury suffered by Plaintiff. Accordingly, Plaintiff has satisfied the third prong of the *Lujan* test. Plaintiff has therefore met the constitutional minimum of Article III standing to seek injunctive relief for the alleged ADA violations he encountered at L & L.

### 3. Standing as to Barriers Not Encountered by Plaintiff

■ Defendant contends that Plaintiff lacks standing for barriers he did not specifically encounter upon visiting L & L because an "injury in fact" is lacking. This Court finds Defendant's argument to be unpersuasive for the following reasons.

First, Plaintiff has standing to allege ADA violations in which he did not encounter, as long as Plaintiff is "among the injured." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130. The legal interest at stake is Plaintiff's right to patronize L & L free from discrimination. The discrimination occurred as soon as Plaintiff encountered an architectural barrier. Plaintiff should not be required to encounter every barrier seriatim within L & L to obtain effective relief.

As discussed above, the alleged discrimination against Plaintiff is a concrete injury that is actual or imminent. There is a likelihood of future injury as to the barriers previously encountered and the barriers that were not previously encountered, so long as the barriers deny access on account of Plaintiff's disability. When Plaintiff returns, all related barriers that still exist would constitute reinjury. Plaintiff would clearly have a personal stake in the outcome because any injunctive relief would redress said injury.

Second, Plaintiff had "actual notice" that Defendant did not intend to comply with the ADA. To satisfy standing requirements to file suit, "'[a]ctual notice' of an intent not to comply with the ADA is sufficient." *Jankey v. Twentieth Century Fox Film Corporation*, 14 F.Supp.2d 1174, 1180 (C.D.Ca.1998). "[A] plaintiff need not repeatedly suffer discrimination in order to assert [ ] rights under Title III." *Delil*, 1997 WL 714866, at *4. The ADA does not require a disabled person to engage in a "futile gesture." 42 U.S.C. § 12188(a)(1); *see also Schonfeld v. City of Carlsbad*, 978 F.Supp. 1329, 1332 (S.D.Cal.1997) (finding that as to Article II standing, an ADA plaintiff alleging inadequate access to a facility is not required to have "'formally' requested to use the facility."). Once Plaintiff either encountered discrimination or learned of the alleged violations through expert findings or personal observation, he had "actual notice" that Defendant did not intend to comply with the ADA. Because Plaintiff is not required to engage in a "futile gesture," Plaintiff should be allowed to sue for the violations he did not encounter. *See* 42 U.S.C. § 12188(a)(1).

Third, the broad language of the ADA supports standing in this instance. The ADA is "a remedial statute, which should be broadly construed to effectuate its purpose of eliminating discrimination against the disabled in our society." *Dunkelberger v. Uni–Marts*, No. CIV. A. 96–CV–7784, 1998 WL 195906, at *2 (E.D.Pa. April 14, 1998) (*citing Kinney v. Yerusalim*, 812 F.Supp. 547, 551 (E.D.Pa.1993), *aff'd*, 9 F.3d 1067 (3d Cir.1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994)); *see Trafficante*, 409 U.S. at 209, 93 S.Ct. 364 (broad definition evidenced congressional intent to "define standing as broadly as is permitted by Article III of the Constitution"). When a party fails to remove architectural barriers in existing facilities, where such removal is "readily achievable," injunctive relief is mandated to "make such facilities readily accessible to and usable by individuals with disabilities to the *extent required by this subchap-*

*ter."* 42 U.S.C. § 12188(a)(2) (emphasis added); 42 U.S.C. § 12182(b)(2)(A)(iv). The ADA provides a private right of action for *"any person* who is being subjected to discrimination on the basis of disability in violation of" Title III. 42 U.S.C. § 12182(a)(1) (emphasis added). The broad language of the statute "expand[s] the definition of what constitutes an injury" and "appear[s] to allow for broad injunctive relief." *Hoepfl,* 906 F.Supp. at 323–24.

Fourth, "[c]ivil rights law depend heavily on private enforcement. . . . Attempts to weaken the remedies available under the ADA are attacks on · the ADA itself and their success would make the ADA an empty promise of equality." Committee Print, Vol. II, 101st Cong., 2d Sess., at 1481–82 (1990). Congress envisioned "clear, strong, consistent, enforceable standards" to address discrimination against disabled individuals. 42 U.S.C. § 12101(b)(2). Moreover, the "inclusion of penalties and damages is the driving force that facilitates voluntary compliance" with the ADA. S.Rep. No. 101–116, at 15 (1989); *see also Trafficante,* 409 U.S. at 209, 93 S.Ct. 364. Denying Plaintiff a remedy in this instance would render the enforcement provisions and standards of the ADA ineffective.

In sum, this Court finds that Plaintiff has standing to sue for injunctive relief for barriers not initially encountered. When Plaintiff allegedly encountered architectural barriers at L & L, discrimination occurred as to all the related barriers within this public accommodation. The policy behind and language of the ADA supports such a conclusion. More importantly, such a conclusion comports with Article III standing requirements. Plaintiff suffered a concrete injury recognized by the ADA that is actual or imminent because, upon Plaintiff's return, all related barriers would constitute the discrimination.

### 4. *Standing as to Unrelated Barriers*

Plaintiff seeks relief for barriers that are not related to his personal disability of non-mobility. For example, Plaintiff seeks ADA compliance for braille sign violations which relate to sight impaired individuals. Such barriers do not specifically constitute discrimination against Plaintiff, yet are prohibited by the ADA nonetheless.

The policy of the ADA clearly supports Plaintiff's assertion that Defendant must be in total compliance with all ADA regulations. However, this proposition would grant Plaintiff standing to sue on behalf of all the disabled. Here, standing would extend beyond the limitations of Article III of the Constitution because Plaintiff cannot prove the requisite "injury in fact." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. When Plaintiff returns to L & L, there is no possibility of reinjury as to those claims. Accordingly, this Court declines to grant Plaintiff standing to sue for barriers that are not related to Plaintiff's specific disability of non-mobility.

The "injury in fact" test requires more than an injury to a cognizable interest, it also requires "that the party seeking review be himself among the injured." *Lujan,* 504 U.S. at 563, 112 S.Ct. 2130. A plaintiff must have a "personal stake in the outcome" sufficient to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Although Congress may, by legislation, "expand standing to the full extent permitted by Art. III, . . . . In no event, . . . may Congress abrogate the Art. III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself,' . . . that is likely to be redressed if the requested relief is granted." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (citations and quotations omitted); *see also Tyler v. Kansas Lottery,* 14 F.Supp.2d 1220, 1228 (D.Kan.1998) (finding no standing for statewide injunction since plaintiff moved to another state).

"In enacting the [ADA], Congress did not intend to alter traditional rules governing when a plaintiff has standing to pursue [a] claim." *Hoepfl*, 906 F.Supp. at 324. "[T]he plaintiff's injury must satisfy the same core requirements of injury in fact caused by the defendant and capable of being redressed by the court." *Id.* at 322. A disabled individual cannot "vindicate the rights of disabled persons generally." *Delil*, 1997 WL 714866, at *5. The Attorney General is "the proper entity to bring such an action." *Id.;* see 42 U.S.C. § 12188(b) ("Enforcement by Attorney General"). The standing requirements of the constitution "exclude [ ] claims for relief brought for purely academic reasons." *Vandermolen v. Roosevelt,* No. 1:97CV 200, 1997 WL 853505, at *2 (W.D.Mich. Oct.28, 1997) (finding that plaintiff suffering from physical and psychological maladies did not have standing to sue for accessibility claims relating to wheel-chair disabled, deaf, and blind persons). Accordingly, this Court finds that Plaintiff's claims not specifically related to non-mobility must be denied due to lack of standing.

## B. *Actionable Claims*

At trial, Defendant argued that Plaintiff should be precluded from introducing any evidence relating to the claims and issues not raised by Plaintiff's Amended Complaint because such evidence would be irrelevant and prejudicial to Defendant.[17] (*See* Def.'s Motion in Limine). Defendant stated that "bringing this action on behalf of all disabled persons for 'full compliance' without any prior notice to L & L ... is extremely prejudicial," and pointed to Plaintiff's failure to file the "proper motion for leave to amend" his Amended Complaint. (Def.'s Closing Argument at 16). This Court must therefore determine whether the claims not raised in Plaintiff's Amended Complaint are actionable.

This Court finds that Plaintiff's Amended Complaint satisfied pleading requirements pursuant to Federal Rule of Civil Procedure 8(a)(2). Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief...." *Id.* All that is required is that the complaint gives " 'the defendant fair notice of what plaintiff's claim is and the grounds upon which it rests.' " *Kimes v. Stone*, 84 F.3d 1121, 1129 (9th Cir.1996) (*citing Datagate, Inc. v. Hewlett–Packard Co.*, 941 F.2d 864, 870 (9th Cir.1991)).

Plaintiff's Amended Complaint satisfied pleading requirements by, in addition to a few specific examples, alleging that Defendant failed "to eliminate readily achievable architectural barriers to equal accessibility" as required by the ADA. (*See* Amended Complaint). This language was sufficient in giving Defendant fair notice of, and the grounds for Plaintiff's claims. Although not specifically plead in the Amended Complaint, this would include all alleged violations resulting from Defendant's failure to remove barriers to the extent readily achievable as required by the ADA. However, although the Amended Complaint was properly plead, Plaintiff must still provide "fair notice" for specific ADA claims not asserted in the Amended Complaint.

In *Independent Living Resources v. Oregon Arena Corporation*, 982 F.Supp. 698, 770 (1997), plaintiffs filed an ADA complaint[18] which focused on "wheel chair" seating. *Id.* After the defendant's facility was opened to the public, plaintiffs submitted a brief "alleging hundreds of additional

---

**17.** Defendant filed a Motion in Limine, which attempted to exclude the presentation of evidence beyond the claims asserted in the Amended Complaint, and evidence of violations unrelated to Plaintiff's specific disability or unencountered by Plaintiff on the basis of relevance. This Court denied the motion without prejudice because such a proffer of evidence also goes to Defendant's credibility, motive, and philosophy.

**18.** The complaint asserted that the defendant had violated the ADA and other state statutes, and listed a few specific examples. *Independent I*, 982 F.Supp. at 770 n. 101.

ADA violations...." *Id.* The plaintiffs, however, did not file an amended complaint. *Id.* at 770 n. 101. The *Independent* court found that the submitted claims were "[t]echnically ... not separate 'claims.'" *Id.* In finding the claims actionable, the court reasoned that "the parties and the court [were] able to identify the alleged violations with reasonable certainty." *Id.*

In this case, this Court finds and concludes that the disclosure of Plaintiff's expert report gave Defendant fair notice of the alleged violations at issue. Prior to trial, Plaintiff's expert, Brent Beals, surveyed approximately 20 L & L Drive–Inns, including Defendant's. (Tr. 11/04/99 at 21–22). Mr. Beals compiled reports that contained pictures, measurements, and his findings regarding ADA compliance. *Id.* at 3–4. At trial, Defendant's counsel objected to the admission of only the *excerpts* of these reports into evidence. (Tr. 11/03/99, vol. II, at 58; Tr. 11/04/99 at 105).[19] On several occasions during the cross examination of Mr. Beals, Defendant's counsel refers to these reports. (Tr. 11/04/99 at 24, 36, 43, 64, 84, and 86). Here, Defendant's counsel concedes that he received copies of Mr. Beals' full reports. (*See* Def.'s Exh. 120). Moreover, Mr. Beals testified that Defendant's counsel referred to these reports at his deposition. (Tr. 11/04/99 at 3). This Court therefore finds that Defendant received copies of Mr. Beals' full reports prior to trial.

These reports provided Defendant with fair notice and allowed Defendant to determine the alleged violations with "reasonable certainty." Accordingly, the claims asserted within Mr. Beals' report are actionable and shall be adjudicated by this Court.

## C. *Equitable Considerations*

Defendant argues that it would be inequitable to hold it responsible for non-compliance with the ADA. Defendant asserts that any liability should be precluded because of Mr. Flores' "good faith" efforts to comply with the ADA, Defendant's reliance in the submitted reports of APC, and Plaintiff's counsel's representation that compliance had occurred in all the L & L restaurants prior to December 1, 1998.[20] Besides the fact that the ADA does not include any such exceptions to compliance, there are four reasons why Defendant's argument is unpersuasive.

First, the scope of the ADA covers not only intentional discrimination, but also the discriminatory effects of "benign neglect, apathy, and indifference." *Helen L. v. DiDario*, 46 F.3d 325, 335 (3rd Cir. 1995). Congress could not have "intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination." *Id.* In fact, Congress delayed the effective date of Title III to allow businesses to learn about the ADA and voluntarily comply. *See* Signing on Statement at 1–2.

Second, the consideration of a party's good faith effort or attempt to comply with the ADA is *only* allowed in civil actions brought by the Attorney General when considering the amount of civil penalty. 42 U.S.C. § 12188(b)(5). There is no other mention of judicial consideration of "good faith" within Title III. Thus, under the accepted practices of statutory construction, if violations existed within the relevant periods at issue, Plaintiff's claims are actionable. *See United States v. Lewis*, 67 F.3d 225, 228 (9th Cir.1995).

Third, because Defendant is not subject to monetary damages, if barriers are found, Plaintiff is only entitled to injunctive relief for the removal of said barriers. Such relief is limited to removal that is

---

19. This Court limited the admittance of Exhibits 2 through 8 to the proffered pictures contained within those exhibits and ADAAG references. (Tr. 11/04/99 at 107).

20. This Court notes that, at the time of Plaintiff's counsel's representation, it seems that Plaintiff's counsel also relied in the findings of APC. However, APC's findings were disputed at trial.

"readily achievable," or easily accomplishable and able to be carried out without much difficulty or expense. 42 U.S.C. § 12182(b)(2)(A)(iv). Unlike an action for civil damages, the detrimental effect of Defendant's alleged reliance is substantially less significant. Fourth, Mr. Flores' aforementioned lack of credibility negates any possible basis for equitable relief. This Court frankly does not believe that any efforts or assertions made by Mr. Flores were in "good faith." Based on the foregoing, this Court finds that Defendant's alleged good faith efforts to comply with the ADA, or reliance in the findings of its retained ADA consultant or in any other representations cannot shield Defendant from liability.

## D. *Burden of Proof*

### 1. *Prima Facie Case*

In order to set forth a prima facie case under Title III of the ADA, a plaintiff must prove that: (1) he has a disability; (2) defendant's restaurant is a place of public accommodation; (3) and he was denied full and equal treatment because of his disability. *Mayberry v. Von Valtier*, 843 F.Supp. 1160, 1166 (E.D.Mich. 1994). Plaintiff must additionally show that he was denied access under circumstances which give rise to the inference that such denial was based solely on his disability. *Id.*

To succeed on a ADA claim of discrimination on account of one's disability due to an *architectural barrier*, the plaintiff must also prove that: (1) the existing facility at the defendant's place of business presents an architectural barrier prohibited under the ADA, and (2) the removal of the barrier is readily achiev-

able. *Gilbert v. Eckerd Drugs*, No. CIV. A. 97–3118, 1998 WL 388567, at *2 (E.D.La. July 8, 1998); *see* 42 U.S.C. § 12182(b)(2)(A)(iv); *see also Pascuiti v. New York Yankees*, No. 98 CIV. 8186(SAS), 1999 WL 1102748, at * 5 (S.D.N.Y. Dec.6, 1999) (plaintiff bears the initial burden of proving that barrier removal is readily achievable). If Plaintiff satisfies his burdens, he has made out a prima facie case of discrimination, upon which the burden shifts to Defendant to present sufficient evidence to rebut such a showing. *See Pascuiti*, 1999 WL 1102748, at * 5 (applying "preponderance of the evidence" burden of rebutting prima facie showing of "readily achievable" barrier removal).

### 2. *Applicable Title III Provisions*

The general rule of Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

Discrimination includes the "failure to remove architectural barriers ... that are structural in nature, in existing facilities ... where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv).[21] When an entity can demonstrate that the removal of a barrier is not readily achievable, discrimination includes the "failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(v).

21. The ADA imposes different requirements on existing facilities than it does on new construction. "For existing facilities, the [ADA] requires the removal of architectural barriers ... where such removal is readily achievable, and permits the use of alternative methods where removal of architectural barriers is not readily achievable. By contrast, in new construction—any facility designed and constructed for first occupancy after January 26,

1993—the Act censures the failure to design and construct facilities ... that are readily accessible to and usable by individuals with disabilities." *Small v. Dellis*, No. Civ. AMD 96–3190, 1997 WL 853515, at *3 (D.Md. Dec.18, 1997) (internal citations and quotations omitted). It is undisputed that Defendant is covered under the ADA requirements for an "existing" facility.

Injunctive relief is an available remedy for violations of section 12182(b)(2)(A)(iv) and such relief shall include "an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities...." 42 U.S.C. § 12188(a)(2). Where appropriate, "injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods...." *Id.*

### 3. *Department of Justice Standards*

The provisions of the ADA only provide "broad principles for the elimination of discrimination against persons with disabilities." *Paralyzed Veterans v. Ellerbe Becket Architects & Engineers, P.C.,* 950 F.Supp. 393, 395 (1996). Consequently, Congress charged the Attorney General with the issuance of more specific standards for compliance with Title III. 42 U.S.C. § 12186(b).

The Department of Justice ("DOJ") adopted as part of its standards with regard to Title III a set of ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG"). Codified in 28 C.F.R. Part 36, App. A, these standards constitute "legally binding regulation." *Independent Living Resources v. Oregon Arena Corporation,* 1 F.Supp.2d 1124, 1130 n. 2 (1998)

("Independent II"). These standards are applied during the "design, construction, and alteration of ... buildings and facilities," 28 C.F.R. Part 36, App. A, at 527, and "provide[s] valuable guidance for determining whether an existing facility contains architectural barriers." *Pascuiti v. New York Yankees,* 87 F.Supp.2d 221, 226 (S.D.N.Y.1999). The DOJ considers "any element in [an existing] facility that does not meet or exceed [ADAAG Standards] to be a barrier to access." *Id.* at 225 (quoting letter from DOJ to defendants). In addition to the provisions of Title III, this Court refers to the ADAAG Standards as adopted by the DOJ.[22]

### E. *Plaintiff's Case*

It is undisputed that L & L is a public accommodation as defined by the ADA[23] and that Plaintiff suffers from a disability within the meaning of the ADA.[24] It is also clear that Defendant's actions or inaction is covered by the ADA.[25] Plaintiff has presented sufficient evidence to prove that he was denied full and equal treatment because of his disability due to architectural barriers. Accordingly, to obtain injunctive relief, Plaintiff must further prove that the alleged barriers are prohibited by the ADA and the removal of said barriers is readily achievable.[26]

---

**22.** *To avoid confusion, this Court uses the term "ADAAG Standard" rather than "ADAAG" when citing the regulations adopted by the DOJ. Also, an "ADAAG" provision number prefaced with "A" will be used for the appendix of the ADAAG Standards which provides additional advisory information, i.e. ADAAG A4.1.1.*

**23.** A public accommodation is any one of a number of entities enumerated in the act provided that the entity's operation "affects commerce." 42 U.S.C. § 12181(7). Restaurants are public accommodations under the ADA. 42 U.S.C. § 12181(7)(B).

**24.** The ADA defines disability as a physical or mental impairment that substantially limits one or more of the major life activities of such individual, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(2).

**25.** Liability for violations under Title III or the ADA falls on "any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). L & L's lease excludes "the apartment units in the back portion of the property and the designated parking stalls which are reserved for the apartment units...." (Def.'s Exh. 140 at 1). Consequently, L & L has a leasehold interest in the remaining parking area *and is therefore liable* under the ADA for said area.

**26.** This Court acknowledges that in certain instances injunctive relief may not be appropriate for *violations of ADAAG Standards that are deemed to be de minimis. Independent I,* 982 F.Supp. at 783 (court "will not require defendant to re-mount the alarms a few inches lower"). Such de minimis violations do not materially impair the use of an area for its intended purpose, nor does it pose any apparent danger to persons with disabilities.

### 1. Moot Claims

Mootness is a jurisdictional defect that can be raised at any time by the parties or the court sua sponte. *Barilla v. Ervin*, 886 F.2d 1514, 1519 (9th Cir.1989). A claim is moot if it has lost its character as a "present, live controversy." *United States v. Geophysical Corp. of Alaska*, 732 F.2d 693, 698 (9th Cir.1984) (citation omitted). The court cannot take jurisdiction over a claim to which "no effective relief can be granted." *Id.* If an ADA "plaintiff[ ][has] already … received everything to which [he] would be entitled, i.e., the challenged conditions have been remedied, then these particular claims are moot absent any basis for concluding that [this] plaintiff[ ] will again be subjected to the same wrongful conduct by this defendant." *Independent I*, 982 F.Supp. at 771 (finding that if claims are moot, "there is no need for [the] court to decide whether there was in fact any violation of the relevant statutes").

Plaintiff concedes that most of the alleged violations have been corrected. (Pl.'s Final Argument at 10–12). The claims that have been remediated are no longer in dispute and are therefore moot. Accordingly, this Court only addresses those remaining "live" claims as set forth below.

### 2. Claims in Dispute

#### a. Entrance ramp too steep

The "slope" or "running slope" measures the rise (or fall) of the path in the direction of travel. *Independent II*, 1 F.Supp.2d at 1147. "A one percent slope rises (or falls) at the rate of one foot vertically for every one hundred feet of distance traveled." *Id.* The ADAAG provides that an accessible route with a "running slope greater than 1:20 [or 5%] is a ramp and shall comply with [ADAAG Standard] 4.8." ADAAG Standard 4.3.7. If the running slope is too steep, "a wheelchair occupant may have difficulty climbing the hill or descend too rapidly and lose control." *Independent II*, 1 F.Supp.2d at 1147. The "maximum slope of a ramp in new construction shall be 1:12 [or 8.33%]." Ramps in existing buildings or facilities may have "slopes and rises as allowed in 4.1.6(3)(a) if space limitations prohibit the use of a 1:12 slope or less." ADAAG Standard 4.8.2. Although ADAAG Standard 4.1.6(3)(a) permits slopes to exceed 1:12 or 8.33% in such instances, "[a] slope steeper that 1:8 [or 12.5%] is not allowed." ADAAG Standard 4.1.6(3)(a)(ii). The portion of L & L's entrance ramp that is perpendicular to the main entrance, runs parallel to and connects with L & L's exterior route. The slope of that portion of the entrance ramp exceeds ADAAG Standards 4.8.2 and 4.1.6(3)(a). Accordingly, L & L's entrance ramp is in violation of the ADA.

#### b. Exterior route excessive cross slope

The ADAAG provides that "[a]t least one accessible route … shall be provided from … [the] accessible parking … to the accessible building entrance they serve." ADAAG Standard 4.3.2(1). A "cross slope" is the slope that is "perpendicular to the direction of travel." ADAAG Standard 3.5. If a cross slope is too steep, a wheelchair occupant may have difficulty steering or, "in extreme cases, the wheelchair may even overturn." *Independent II*, 1 F.Supp.2d at 1147. "Nowhere shall a cross slope of an accessible route exceed 1:50 [or 2%]." ADAAG Standard 4.3.7. The cross slope of L & L's exterior route exceeds ADAAG Standard 4.3.7. (*See* Pl.'s Exhs. 201–204). Accordingly, L & L's exterior route is in violation of the ADA.

#### c. Parking space not closest to entrance

The ADAAG provides that where parking is provided for public buildings, a certain number of parking spaces on "the shortest accessible route of travel from adjacent parking to an accessible entrance" must be specially designated for people with disabilities. ADAAG Standards 4.1.2(5) and 4.6.2. The parking space that

L & L provides for disabled individuals is located at the far lefthand corner of its parking lot. This location does not provide the "shortest" route to L & L's entrance. Accordingly, L & L's parking space is not accessible and in violation of the ADA.

### d. Pay phone lacks clear maneuvering space

Claims not asserted in Plaintiff's Amended Complaint or contained in Mr. Beals' survey report are not actionable because Defendant has not received fair notice. Because this Court finds that Plaintiff has failed to prove that this violation was contained in Mr. Beals' survey report, this claim is dismissed.

### 3. Readily Achievable Barrier Removal

 To obtain injunctive relief for the above-listed barriers in violation of the ADA, Plaintiff must also prove that removal of said barriers is "readily achievable." The ADA defines the term "readily achievable" to be "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). In making a determination of whether an action is "readily achievable" factors to consider include: (1) the nature and the cost of the action needed; (2) the overall financial resources of the facility; (3) the overall financial resources of the covered entity; and (4) the type of operation of the covered entity. Id.

This Court finds that removal of the barriers relating to the entrance ramp and exterior route is readily achievable. This Court bases its determination on the following reasons. First, Plaintiff's expert, Brent Beals, based on his prior experience as a contractor, testified that barrier removal for these barriers would involve minimal cost and effort. (Tr. 11/04/99 at 8–10). Mr. Beals also suggested various reasonable alternatives for the removal of these barriers. (Tr. 11/16/99 at 179–180). Second, ADA compliance officer Mr. Flores acknowledged that barrier removal is "very inexpensive." (Tr. 11/16/99 at 63). Third, the photographs entered into evidence indicate that it would not be difficult or expensive to remediate the barriers at issue. Fourth, the L & L franchisees enjoy average annual revenues of approximately $500,000–$600,000. Id. at 60. It is obvious to this Court that correcting these barriers would merely involve some asphalt and some planning. This Court is confident that L & L can accomplish this without much difficulty or expense. Accordingly, the architectural barriers relating to the entrance ramp and the exterior route are prohibited by the ADA and must be removed.[27]

 However, this Court finds that relocating the accessible parking space is not readily achievable. L & L argues that relocating the parking space would force it to lose a parking space. (Def.'s Closing Argument at 34–35; Tr. 11/15/99 at 68). As a result, L & L would allegedly be in violation of a Land Use Ordinance. (Def.'s Closing Argument at 35). L & L further argues that, its landlord told it to share

---

27. Barrier removal must comply with the applicable requirements for alterations. 28 C.F.R. § 36.304(d). Any alteration to a place of public accommodation "shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 28 C.F.R. § 36.402(a)(1). To the "maximum extent feasible" only applies to "the occasional case where the nature of an existing facility makes it virtually impossible to comply" with accessibility standards. 28 C.F.R. § 36.402(c). In these circumstances, the alteration shall provide the "maximum physical accessibility feasible." Id.

Also, if strict compliance is "technically infeasible," the alteration shall provide accessibility to the "maximum extent feasible." ADAAG Standard 4.1.6(j). Technically infeasible is defined as an alteration that has "little likelihood of being accomplished because existing structural conditions would require removing or altering a load-bearing member which is an essential part of the structural frame; or because other existing physical or site constraints prohibit modification or addition of elements...." Id.

the parking lot with other commercial tenants. (Tr. 11/16/99 at 53; *see* Def.'s Exh. 127(A)). L & L's parking lot has a very limited number of spaces. In fact, beside sharing the parking lot with other businesses, L & L's lease excludes "the designated parking stalls which are reserved for the apartment units. . . ." (Def.'s Exh. 140 at 1). Although the actual cost of relocating the parking space would just involve restriping the parking area, the aforementioned problems clearly outweigh the benefit of this modification.[28] Accordingly, this Court finds that relocating the parking space is not readily achievable. This claim for injunctive relief is denied.

## IV. *CONCLUSION*

In accordance with the foregoing, IT IS HERESY ORDERED THAT:

1. Plaintiff's claim for injunctive relief relating to the parking space be DENIED.

2. Plaintiff's claim for injunctive relief relating to the pay phone be DISMISSED.

3. Defendant is liable for violating the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, for the following claims. Defendant is ordered to take the following steps to improve access to its public accommodation within 90 days of this order:

a. The entrance ramp must be modified to comply with ADAAG Standards 4.8.2 and 4.1.6(3)(a).

b. The exterior route must be modified to comply with ADAAG Standard 4.3.7.

IT IS SO ORDERED.

28. As discussed above, L & L currently provides an exterior route along its facility. With the modifications required by this order, L & L's entrance shall be accessible from the designated accessible parking space.