THEATRE MANAGEMENT GROUP, INC. And LRW Theatre Group, both d/b/a Warner Theatre Operating Group, J.V., Appellants,

v.

John F. DALGLIESH, Jr., Appellee.

No. 99–CV–867.

District of Columbia Court of Appeals.

Argued Nov. 28, 2000.
Decided Jan. 18, 2001.

Melissa A. Murphy–Petros, Chicago, IL, with whom James T. Ferrini and William H. Schladt, Gaithersburg, MD, were on the brief, for appellants.

James E. Colleran, Jr., Philadelphia, PA, with whom Nikolaus F. Schandlbauer, Washington, DC, was on the brief, for appellee.

Before FARRELL, RUIZ, and REID, Associate Judges.

Farrell, Associate Judge:

Plaintiff-appellee Dalgliesh, a partially disabled person, was injured when he fell as he began walking down an aisle ramp leading to his seat in the Warner Theatre. In his ensuing action for negligence against appellants Theatre Management Group, Inc. and LRW Theatre Group (both doing business as Warner Theatre Operating Group, J.V.), the jury awarded him $983,177.00 in damages. On appeal, the primary issue is whether the trial judge erred in allowing the jury to consider, as evidence of the standard of care, the fact that under the Americans With Disabilities Act (ADA)[1] and related regulations an interior ramp may not have a slope exceeding a ratio of 1:12, or one unit of rise for every twelve units of distance. Appellants contend that the decisional law of this jurisdiction prohibits use of such statutes and regulations to prove negligence unless they are laws designed to protect "public safety," and that the ADA, as an anti-discrimination law, does not meet that description. We conclude both that our decisional law is not so inflexible in this regard as appellants make it out to be and that, in any event, the ADA has an obvious safety component to the ends it is designed to serve. We therefore sustain the trial judge's admission of the ADA standard as evidence of the care required in the circumstances. We reject appellants' additional claim that the trial court erroneously failed to order a remittitur, and therefore affirm.

## I.

Dalgliesh suffers from Charcot Marie Tooth Syndrome (CMT), a rare neurological disorder that causes the myelin—the coating of the nerves—in the arms and

---

1. 42 U.S.C. § 12101 et seq.

legs to deteriorate over time. As the myelin is lost, electric conduction through the nerves to the attached muscles slows down, generally resulting in progressive neurological impairment. Dalgliesh was diagnosed with CMT at the age of twenty, and at the age of thirty-five was fitted with MAFO braces for both legs.[2] The braces supported his feet and legs but prevented all movement in his ankles. By the time he was age forty-three, he was using a cane in addition to the braces. The immobility of his feet, combined with sensory problems in the feet, the MAFO braces, and the cane all made it difficult for him to negotiate uneven surfaces.

Viewing the evidence in the light most favorable to Dalgliesh, on March 18, 1994, he came to the Warner Theatre with four friends to attend a show. Entering the theatre some forty-five minutes before showtime, he and a companion, Bill Tucci, were directed to the far end of the lobby where they were met by a female usher named Heidi. Dalgliesh told her that he had a muscular disorder and would need assistance getting to his seat because he walked with a cane and wore MAFO braces. After Heidi left briefly and returned, he again told her it was important that he get help to his seat "because when I'm in crowds and ... there are surfaces ... I'm unsure of, I really like to have assistance." Heidi replied, "No problem. I'll take care of that."

Dalgliesh, Tucci, and Heidi waited in the lobby for Dalgliesh's other friends to park the car and join them. They talked about Dalgliesh's CMT, and at one point he showed Heidi the MAFO braces. When she asked what kind of help he wanted he replied, "I could have [Tucci] on one arm and you or someone else on the other arm as long as I have support on each side.

Or, if you have a wheelchair of some sort ..." Heidi said "No problem." By this time, according to Dalgliesh's testimony, he had asked Heidi for assistance three or four times and was confident she would provide it.

When the others arrived Dalgliesh beckoned to Heidi, who told the group to follow her into the auditorium, which by now was very crowded. As they entered the theatre Heidi turned and took the tickets from Tucci, then went down the center aisle and, after finding the seats, summoned the group to follow her. Since the house lights had begun to blink, Dalgliesh was anxious: "people were all around me. I didn't see any help. And I was concerned ... I had asked for help. I had been told I was going to get it." He took a step forward on the aisle ramp and fell, landing on his right leg. He could feel the bone in his leg snap, experiencing pain more excruciating than he had ever felt. As he was carried out of the auditorium by paramedics, Heidi apologized to him saying, "I'm so sorry I didn't get you the help ... I should have done more. I should have gotten you a wheelchair or something." Dalgliesh suffered a leg fracture from the fall that was very slow to heal and, in combination with the underlying CMT, resulted in his being permanently confined to a wheelchair.

## II.

### A.

At trial Dalgliesh presented expert testimony by an architect, Robert D. Lynch, that the slope at the top of the aisle ramp (where Dalgliesh fell) was 13.5 percent or a ratio of one unit of rise (or "vertical distance") to 4 units of "run" or level distance.[3] Lynch testified that uniform archi-

---

**2.** A MAFO brace is a "molded ankle foot orthosis" designed to support the leg while the wearer is walking.

**3.** "The ... area up at ... the back of the theatre is almost perfectly level and as soon as you get to the edge of the ramp it drops

off.... It's ... 13 and-a-half percent right after you get past the edge of the slope." [Tr. 189]

tectural standards for ramps going back to 1961 ("probably the oldest unchanged ... accessibility standards" [Tr. 195] ) establish "a run of 12 units [a ratio of one to twelve] as [the] maximum slope for a ramp." [*Id.*] Most recently, he stated, the Accessibility Guidelines for Buildings and Facilities promulgated under the ADA specify a "one in 12 slope" as the "maximum allowable [ratio]" for ramps [Tr. 196, 199]. In Lynch's opinion, the ramp at the point where Dalgliesh fell "significantly" exceeded "maximum ramp slopes ... contained within the [ADA] and/or the architectural guidelines which supplement and apply to [it]." [Tr. 236] Although Lynch recognized that "the basic nature of the geometry of the theatre" meant that the ramp slope could not be altered [Tr. 238],[4] he testified to specific steps—installation of handrails, warning signs, or an alternative entry route into the auditorium—that in his view appellants could reasonably have taken to provide safe access for someone with Dalgliesh's condition.

### B.

Appellants objected to any evidence about the ADA and its accessibility standards on the ground that the ADA is not a "public safety" statute and thus its specifications could not provide evidence of the standard of care in what they term this "garden variety" negligence action. The trial judge disagreed. Besides instructing the jury on a landowner's common law duty of care in the circumstances to keep premises safe and warn invitees of hazardous conditions, he instructed it that the ADA and its accompanying regulations "set[ ] forth a standard of conduct" which it could consider in deciding whether appellants were negligent. On appeal, appellants renew the argument that in this jurisdiction only public safety laws can furnish proof of the standard of care in a negligence suit, and that the ADA does not fit that description.[5]

Dalgliesh makes no claim that the trial judge erred in refusing to instruct that violation of the ADA would amount to negligence *per se* on appellants' part. *See, e.g., Ceco Corp. v. Coleman,* 441 A.2d 940, 945 (D.C.1982).[6] Rather, in defending admission of the ADA evidence, his primary argument is that this court has never tied evidentiary *use* of a statute or regulation— as distinct from *per se* liability based on violation of it—to the "public safety" nature of the enactment. He points particularly to *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268 (D.C. 1987), where we canvassed the law on the relation between negligence and a regulatory standard and stated that, "even where the court does not perceive a public safety purpose in the legislative enactment, the statutory violation may be admitted as evidence of negligence, although it does not constitute negligence *per se.*" *Id.* at 1274.

Appellants respond that this statement in *Rong Yao Zhou* was dictum (we held there that the statute in question "has a public safety purpose" whose unexcused violation would constitute negligence *per se, id.* at 1275), and that our decisions and binding decisions of the United States Court of Appeals for the District of Columbia Circuit[7] recognizing evidentiary use of

---

4. The Warner Theatre was built in 1924. A historic renovation, including restoration and modernization of the interior theatre space, was begun in 1988–89 and completed in 1992.

5. Dalgliesh makes what amounts to an alternative harmless error argument based on the evidence before the jury-independent of the ADA-that appellants breached their common law duty to provide him reasonably safe access to his seat once he warned them of the danger he faced as a result of his condition.

In view of our disposition of the case, we need not pass on that contention, although the prominence of the ADA standard in the testimony and the judge's instructions tend to make it a weak one.

6. Dalgliesh advanced that theory below but the trial judge rejected it. The issue is not before us on appeal.

7. *See M.A.P. v. Ryan,* 285 A.2d 310 (D.C. 1971).

a law to prove negligence have all done so in cases where the statutory purpose was protection of the safety of the public or a sub-part thereof.

Appellants may be correct on both points, but, as we explain shortly, that does not avail them. It is true that the trial judge cited only one District of Columbia case as actually holding that a non-public-safety regulation could be properly submitted to the jury as evidence of the standard of care. (Dalgliesh in his brief cites none). And curiously that decision, *Peigh v. Baltimore & O.R. Co.*, 92 U.S.App. D.C. 198, 204 F.2d 391 (1953), does not support the proposition, although it has repeatedly been cited for it.[8] Thus, in *Whetzel v. Jess Fisher Management Co.*, 108 U.S.App. D.C. 385, 282 F.2d 943 (1960), the court stated that in *Peigh*

> [w]e held the doctrine of negligence *per se* inapplicable to the defendant's illegal conduct ... because the prime purpose of the regulation was, in our view, to expedite traffic and commerce and not to protect passing motorists. Such violation was, however, admissible as evidence of negligence.

*Id.* at 389, 282 F.2d at 947 (footnote omitted). So too, in *Stevens v. Hall*, 391 A.2d 792 (D.C.1978), this court read *Peigh* as holding that "the per se rule should not be applied for the plaintiff's benefit. Because the purpose of the railroad regulation was to expedite traffic and encourage commerce, not to protect approaching motorists, the alleged violation, if proved, could at most be evidence of negligence, not

negligence per se." *Id.* at 795–96. *See also Rong Yao Zhou*, 534 A.2d at 1274 (citing *Peigh* for principle that non-safety enactment "may be admitted as evidence of negligence").

These statements, although grounded shakily in *Peigh*, provide substantial indication of how this court would resolve the question of evidentiary use of a regulation not strictly safety in nature. Indeed, in our most recent statement on the subject, *Jimenez v. Hawk*, 683 A.2d 457 (D.C.1996), we summarized the law as being that "code violations, *especially* [of] those [enactments] with the public safety as an objective, are evidence of negligence," *id.* at 461 (emphasis added), implying that statutes without that objective but setting forth an arguable standard of care are admissible to prove negligence. Also, the distinction between public safety enactments and others has been partly erased by our decisions allowing evidentiary use of the former even when the statute was not designed to protect persons in the plaintiff's class. *See, e.g., Thoma v. Kettler Bros., Inc.*, 632 A.2d 725, 730 (D.C.1993) (upholding admission of OSHA workplace safety regulations designed to protect employees, in suit brought by non-employee visitor to work site); *Jeffries v. Potomac Development Corp.*, 261 U.S.App. D.C. 355, 361–62, 822 F.2d 87, 93–94 (1987) (citations omitted). In this case, it is conceded that the Warner Theatre is a place covered by the ADA and that Dalgliesh is a member of the class protected by the statute, however that protection is defined.

8. *Peigh* arose from injuries to the plaintiffs when their car struck a boxcar standing on the defendant-railroad's train tracks that ran along K Street, N.W. The primary issue was whether the trial judge properly directed a verdict for the defendant. The court of appeals first agreed with the judge's rejection of the plaintiffs' theory of negligence *per se* based on asserted violation of a police regulation that prohibited parking or storage of railroad cars on streets "for an unreasonable time." The regulation had been promulgated as a means of "expediting traffic and encouraging commerce in the city," not to promote

"[t]he safety of passing motorists," "at least [not] in any sense which would make applicable the doctrine of negligence *per se.*" 92 U.S.App. D.C. at 200, 204 F.2d at 394. The court nonetheless concluded, applying common law principles of negligence, that a jury issue was presented as to whether the protruding "rear of the boxcar was so lighted as to give sufficient warning to motorists." *Id.* at 201, 204 F.2d at 394. The court nowhere stated or implied that the police regulation would be admissible as evidence of the standard of care on the warning issue.

Ultimately, however, this case does not compel us to resolve the issue of evidentiary use of statutes having no public safety objective, because it is evident to us that the ADA—and specifically the physical accessibility guidelines promulgated under it—possess such an aim. Title III of the ADA provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Discrimination includes the "failure to remove architectural barriers ... that are structural in nature ... where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv); *see also* 28 C.F.R. § 36.304. If removal of a barrier is not readily achievable, discrimination may yet be shown by the "failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(v); *see also* 28 C.F.R. § 36.305. As mentioned earlier, Department of Justice (DOJ) standards issued under the ADA include the ADA Accessibility Guidelines for Buildings and Facilities (see 28 C.F.R. Part 36, App. A), which are "legally binding regulation." *Independent Living Resources v. Oregon Arena Corp.*, 1 F.Supp.2d 1124, 1130 n. 2 (D.Or.1998). The DOJ considers any element of a facility that does not meet or exceed the Guidelines to be a barrier to access. *See Parr v. L & L Drive Inn–Restaurant*, 96 F.Supp.2d 1065, 1086 (D.Hawai'i 2000). And, as the jury learned in this case, under the Guidelines the maximum slope of an interior ramp in an existing facility shall generally be a ratio of 1:12, or one unit of rise for every twelve units of run. *See* 36 C.F.R. Pt. 1191, App. A, § 4.82 (1999).

What seems to us to be the obvious relationship between the ADA's barrier removal requirement and the safety of a particular sub-portion of the public was well-stated by the trial judge in this case:

> Obviously, if a handicapped person cannot safely use a facility or accommodation, access to the facility or accommodation is seriously compromised. This reality is closely akin to the actual denial of access, because if a person cannot safely use a building, then access to the building is significantly restricted. And restricted access can amount to discrimination.

Since, as we conclude, the ADA standard governing ramps embodies a public safety objective, it satisfied any admissibility requirement of such purpose that can be gleaned from our decisions.

Appellants contend, alternatively, that the evidence was unrebutted that they complied with the ADA's requirement of barrier removal by providing alternative means of access to seating,[9] *i.e.*, a wheelchair available on request and a special seating area in the rear of the theatre. It needs reminding, however, that the issue before the jury was not whether appellants in fact violated the ADA or any other statute (that would have been so if the case were tried on a theory of negligence *per se* ), but whether they breached their duty to the plaintiff in the circumstances, and whether that breach caused his injuries. The ADA standard constituted evidence of the standard of care, no more.[10] *See Thoma*, 632 A.2d at 730 (quoting *Curtis v. District of Columbia*, 124 U.S.App. D.C. 241, 243, 363 F.2d 973, 975 (1966)) (regulations [in *Curtis* ] were " 'competent [and admissible] not in and of themselves as evidence of negligence, but as evidence of a standard of care by which the jury must measure the conduct of the defen-

---

**9.** As stated earlier, the slope of the ramp concededly could not be altered.

**10.** To the extent the trial court's instructions more broadly asked the jury to consider

whether the ADA itself had been violated, appellants never objected to the instruction on that ground.

dants in determining whether they exercised that due care required in the situation' ").[11] The jury had ample evidence before it from which to find that appellants had been negligent. Besides the deviation from the norm in the slope ratio of the ramp,[12] the jury had the opinion of the plaintiff's expert that a warning sign could have been posted or hand railings installed at the uppermost point of the ramp, or an alternative entrance to the auditorium constructed for disabled persons at relatively modest cost. Moreover, Dalgliesh and his lay witnesses testified that the usher (who appellants concede was their employee-agent) disregarded his repeated requests for a wheelchair or other assistance in light of his condition, leaving him essentially to fend for himself as the theater lights began to dim. We find no basis on which to disturb the trial court's submission of liability to the jury.

### III.

◼ The jury awarded Dalgliesh a total of $983,177 in damages, $296,677 of which was for future medical expenses. Appellants argue that the trial judge erred in not granting a remittitur of the entire amount for future medical expenses because Dalgliesh's primary witness on that issue, Betsy Bates, was a nurse and a "life care planner," not a doctor, and therefore not qualified to render an opinion on what Dalgliesh's future medical needs would be.[13]

◼ We start by noting that, although Bates testified that in the aggregate Dalgliesh's future medical costs would be $741,694, the jury awarded him only forty percent of that amount. Since appellants' argument is not that the award was "excessive," however, but rather that Bates was not qualified to give any estimate of future medical needs, we must examine their argument. We do so recognizing that the trial court's determination whether an expert witness is qualified to give an opinion on a subject is reviewed only for abuse of discretion. See In re Melton, 597 A.2d 892, 901 (D.C.1991) (en banc).

As the trial court found, Bates was an experienced nurse who had practiced "rehab nurs[ing]," working with patients who had experienced catastrophic injury or chronic illness and needed therapy. She had also worked as a "life care planner," someone who "prepares a report called a life care plan [which] projects the treatments and services and costs of what clients will need in the future depending on what their diagnosis is." The trial judge, concerned about Bates's qualification to project the kinds and duration of medical treatment Dalgliesh would need (as distinct from her competency to price those services), painstakingly examined each component of the projections she proffered. Only two give us any hesitation.

◼ Most of the standard medical care, equipment, and supplies Bates said Dalgliesh would need stemmed from his permanent confinement to a wheelchair as a result of the accident. The trial judge could permissibly find that a nurse specializing in rehabilitation, as Bates did, had sufficient knowledge about wheelchair-related infirmities to offer an opinion on these items. The same is true of her

11. See also Klein v. District of Columbia, 133 U.S.App. D.C. 129, 131–32, 409 F.2d 164, 166–67 (1969):
    [T]he building code was an important piece of evidence as a reasonable standard of care in maintaining sidewalks in a safe condition. It should have been admitted with an explanation to the jury that they were to consider, not its violation, but rather its embodiment in the building code as indicating the requirements for a safe sidewalk.

12. As explained earlier, the jury heard testimony that the ramp slope exceeded not only the ADA standard but uniform architectural standards going back to 1961.

13. At trial appellants did not object to Nurse Bates's qualifications as a "life care planner," but rather to whether these qualified her to project Dalgliesh's future medical needs. [R. 373]

opinion that he would need an in-home aide to assist him with basic living needs such as cleaning, washing, and dressing. And her projection of need for physical therapy was based not solely on her own experience, but on the recommendation of Dr. Cavanaugh, Dalgliesh's treating physician. Bates also forecast, however, that Dalgliesh would need psychological counseling and particular medications, and appellants legitimately question her expertise to opine on his future needs in these specialized areas. But Dalgliesh testified that he had been treated by a psychologist for depression and encouraged by others to seek psychiatric care since the accident, and the trial judge restricted Bates to opining that Dalgliesh would benefit from short-term psychological counseling of one session a week for a six-month period. In permitting limited testimony by her on that subject, he did not abuse his discretion. Similarly, the medications for which Bates projected need were chiefly those Dalgliesh was already taking for conditions such as pain control, sleeplessness, and anxiety documented in his medical reports. Although Bates's qualification to predict that he would need those medications permanently was problematic, we will not disturb the judge's call on that particular sub-part of his careful exercise of discretion. *See Johnson v. United States,* 398 A.2d 354, 362 (D.C.1979).

*Affirmed.*