*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CV-0354

CAROLYN L. GREENE, APPELLANT,

V.

CHILDREN'S NATIONAL MEDICAL CENTER, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CA-004732-B)

(Hon. Shana Frost Matini, Trial Judge)

(Argued September 20, 2022     Decided October 3, 2024)

*Peter L. Scherr* for appellant.

*Crystal S. Deese* for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and STEADMAN, *Senior Judge*.[*]

---

[*] Associate Judge AliKhan and Senior Judge Fisher were originally assigned to this case. Following Judge AliKhan's appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Associate Judge Easterly took her place on the panel. Following Judge Fisher's retirement, effective August 22, 2024, Judge Steadman took his place on the panel.

DEAHL, *Associate Judge*: Carolyn Greene slipped and fell while visiting her grandson at Children's National Medical Center. She sued Children's, alleging (1) that she slipped in liquid residue left behind by a ride-on floor scrubbing machine operated by one of its custodians, (2) that there were no warning signs or cones in the vicinity to alert her to the wet floor, and (3) that she sustained "severe and permanent injuries to her left upper extremity, wrist and hand" as a result of her fall. After discovery, the trial court granted Children's motion for summary judgment, concluding that Greene had not raised any genuine issue of material fact about whether Children's was on notice that the floor was wet where Greene slipped.

We reverse. Greene adduced evidence sufficient for a reasonable jury to conclude that Children's own employee created the dangerous condition that led to her injury, so that she did not have to make any additional showing that Children's was on notice of a condition that it created. Greene offered evidence from which a jury could reasonably conclude that the liquid she slipped in was left by a floor scrubbing machine operated by a Children's custodian, so that the question of Children's liability for her fall is properly left to a jury.

## I.  Factual and Procedural Background

We recount the facts in the light most favorable to Greene, as the non-moving party opposing summary judgment.  *See Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983).

*The evidence about Greene's slip and fall*

Greene was visiting her grandson, J.G.—who was hospitalized on the fourth floor of Children's hospital—one Sunday morning.  She arrived at the hospital around 8:00 a.m.  She and J.G. spent some time in the hallway outside of J.G.'s room after her arrival, and she and J.G. also made a trip to the hospital's cafeteria, where they spent ten to fifteen minutes.  On her walks to-and-from the cafeteria she did not see any liquid on the floor, "wet floor" signs, or cleaning machines.  Greene and her grandson then returned to J.G.'s room, and after another five to ten minutes—at around 9:00 a.m.—Greene decided to go to the coffee room to heat up her coffee.

Greene then slipped and fell in the hallway outside of J.G.'s room, between J.G.'s room and a nurses' station that was at a "T" intersection of two hallways.  As she was getting up she saw that the floor was wet behind her, with visible streaks of water both in front of her and behind her.  Several people came to help her, including a custodian who began to mop up the floor and asked, "[W]here are the signs that

should have been on the floor[?]  I didn't see any signs."  The group then walked Greene down the hallway to a nearby nurses' station, where Greene saw Noel Parker, a hospital custodian, driving a ride-on auto scrubbing machine used to clean floors. There "was a lot of water on the floor behind him," in the same streaks that were visible where Greene fell in the hall leading to the nurses' station, "around the front of the nurses' station," and in "different places on the floor."  Greene did not notice whether the machine's brushes were down, but insisted that Parker was "on the machine driving" it, that "[t]he machine was moving," and that "[i]t was cleaning the floor," leaving "water on both sides of the hall where the machine had been."

According to Greene, one of the people who helped her up was a supervisor who called Parker over and talked to him about the scrubbing machine and the wet floor.  The supervisor asked whether Parker had been cleaning the floors on the side of the hall where the fall occurred and he said he had not.  The supervisor then asked where the warning signs were, and Parker said they were there, and the supervisor responded that they were not.  Greene was then taken down to the emergency room for treatment, where she asked the doctor if she was "going to have to pay for this," and the doctor said she would not because "the hospital is taking responsibility" for the fall.

In his deposition testimony, Parker denied operating the scrubbing machine on the fourth floor on the day of Greene's fall. He said that on that day, he started his shift at about 7:00 a.m., brought the ride-on scrubbing machine from the basement to the fourth floor at around 8:00 a.m., and then parked the machine by an elevator close to the nurses' station for possible later use. He then began dust mopping, using what amounts to a large handheld push broom, and he placed caution signs on the floor to alert people that he was dust mopping. But he claimed that he never got around to actually scrubbing the floors with the machine that day, despite the fact that his shift did not end until 3:30 p.m., about 6.5 hours after he claimed to have put the warning signs in place. Parker also explained that he would not have used the scrubbing machine before 9:00 a.m., which is roughly when Greene fell, because "at that time of the morning . . . we have children sleeping, so you won't make any noise to arouse them because they are sick children." He also said that he did not "know anything about a slip and fall until Monday," the day after Greene's fall.

This last piece of Parker's testimony was inconsistent with testimony and contemporaneous communications from Duc Ntsomi, a Children's Environmental Services supervisor who was on duty that day. Ntsomi testified that he spoke with Parker about Greene's fall on the day it happened. Ntsomi did not know what led to

Greene's fall, but he sent an email later that night—technically, just after midnight Monday morning—which stated:

> Today at about 10:30am, I received a call from a nurse regarding one of the visitor[s] that fell after the ride on machine was used on 4Main by N. Parker[.] When I asked N. Parker about the incident, he stated that he never used the ride on by the area where the fall occur[ed] & the wet sign was nearby.

By the time of his deposition, Ntsomi could not recall which nurse he spoke to or what that nurse said, although he confirmed that the email was in reference to Greene's fall.

Both Greene and Children's also offered expert testimony that they expected to admit at trial. One Children's expert was Douglas Hrobak, an expert mechanical engineer who opined on the standard of care for floor cleaning operations and best practices for investigating slip and fall incidents. Although Hrobak's testimony is largely irrelevant for our purposes, he testified that if Parker was indeed only dust mopping (as Parker testified), then "there would be no need to place warning signs related to slippery or wet floors" (as Parker said he had done). Children's also introduced testimony from one of Parker's supervisors, Rusty Siedschlag, who agreed with Hrobak that if Parker had only been dust mopping on the fourth floor, warning signs "would not be required" to be in place. Siedschlag also corroborated

Parker's testimony that custodians would generally not use floor scrubbing machines before 9:00 a.m., to avoid waking up patients.

Greene's expert was Robert Fertal, Jr., an expert on premises liability and commercial cleaning systems and practices. Based on Greene's description of the liquid that she saw in "streaks through the hallway," Fertal testified that the liquid was likely "water or solution from the machine." While acknowledging that he "can't be certain where it came from," he nonetheless insisted that "it's highly probable that [the liquid] came from a floor machine of that nature because that is quite a common occurrence when using that machine." He rejected the idea that Greene might have slipped in some liquid that a patron had spilled, explaining that if the liquid "was in a lot of areas" as Greene claimed, it "kind of doesn't make logical sense that there [would be] spills everywhere," whereas if there were "streaks everywhere, [that] would be indicative of a machine being used down the hallways." Fertal also corroborated Hrobak's and Siedschlag's testimony that there would have been no reason for warning signs to be up if in fact Parker were only dust mopping. Fertal added that it would have been improper for Parker to put up warning signs if he were only dust mopping, because using such signs when they are not necessary dilutes their force, or in his words, "[t]he signage . . . becomes ineffective" if used when it is "not necessary."

*The trial court proceedings*

Greene sued Children's, alleging that it acted negligently when its employee created a hazardous condition that it did not warn her about. At the close of discovery, Children's moved for summary judgment. The trial court granted the motion, explaining that "Ms. Greene relie[d] on her own speculation and conclusory allegations to attempt to prove that the floor scrubber must have been in the hallway where she fell, le[ft] a trail of water, and creat[ed] the dangerous condition." The court reasoned that because Greene's claim required speculation to conclude that the liquid was left behind by the use of the scrubbing machine, she could not carry her burden to show that by a preponderance of the evidence that Children's was on notice of the dangerous condition that led to her fall.

Greene now appeals.

## II. Analysis

"We review the trial court's grant of summary judgment de novo." *Reeves v. Wash. Metro. Area Transit Auth.*, 135 A.3d 807, 811 (D.C. 2016). We will reverse a grant of summary judgment "if an impartial trier of fact, crediting the non-moving party's evidence, and viewing the record in the light most favorable to the non-moving party, may reasonably find in favor of that party." *Tolu v. Ayodeji*, 945 A.2d

596, 601 (D.C. 2008) (quoting *Weakley v. Burnham Corp.*, 871 A.2d 1167, 1173 (D.C. 2005)). While we view the evidence in the light most favorable to the non-moving party, the non-moving party is "not entitled to 'inferences based on guess or speculation.'" *Ukwuani v. District of Columbia*, 241 A.3d 529, 541 (D.C. 2020) (quoting *Vogel v. D.C. Off. of Planning*, 944 A.2d 456, 464 (D.C. 2008)).

"To establish negligence" in general, "a plaintiff must show that '(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff.'" *Freyberg v. DCO 2400 14th St., LLC*, 304 A.3d 971, 976 (D.C. 2023) (quoting *Murphy v. Schwankhaus*, 924 A.2d 988, 991 (D.C. 2007)).

There is no dispute here that Children's owed Greene (and its other visitors and patrons) a duty to protect against, and warn about, any hazards that it knew about or had constructive notice of. *See generally Theatre Mgmt. Grp., Inc. v. Dalgliesh*, 765 A.2d 986, 989 (D.C. 2001) (discussing "a landowner's common law duty of care . . . to keep premises safe and warn invitees of hazardous conditions"). And if Children's, via its employees, was "responsible for creating the dangerous condition" that led to Greene's injuries, that alone would put it on constructive notice of the hazard. *Croce v. Hall*, 657 A.2d 307, 310 n.6 (D.C. 1995); *see also Sandoe v. Lefta Assocs.*, 559 A.2d 732, 740 (D.C. 1988) ("A [landowner] . . . is responsible,

of course, for injuries resulting from risks created personally or by his employees." (quoting *Smith v. Arbaugh's Rest., Inc.*, 469 F.2d 97, 106 n.48 (D.C. Cir. 1972))); *Seganish v. D.C. Safeway Stores, Inc.*, 406 F.2d 653, 655-56 (D.C. Cir. 1968) (same).

The dispositive issue in this case thus boils down to whether a reasonable jury could conclude that Greene slipped and fell on water that was left behind by the scrubbing machine that she claims to have seen Parker operating on the fourth floor on the morning of her fall. It could. If a jury believes Greene about seeing streaks of water on the floor where she fell, about seeing Parker nearby on the scrubbing machine with similar streaks of water behind him, and further credits her expert that the most likely explanation for both sets of streaks was that they came from the floor scrubbing machine, then that alone might have permitted a jury to rule in her favor. Whether to credit that testimony is for the jury to decide, not for the trial judge at the summary judgment stage of proceedings. *See Katz v. District of Columbia*, 285 A.3d 1289, 1301 (D.C. 2022) ("At the summary judgment stage, the trial court does not make credibility determinations or weigh the evidence, which are functions reserved for the trier of fact." (quoting *Sibley v. St. Albans Sch.*, 134 A.3d 789, 809 (D.C. 2016))).

We need not definitively opine on whether that evidence alone would have cleared the summary judgment bar, however, because Greene had quite a bit more in her favor. Remember that Parker made two core claims that were in serious tension with Children's other witnesses: First, he claimed that he did not use the scrubbing machine at all on the morning of Greene's fall (except to move it up to the fourth floor), and second, he claimed that he had in fact put warning signs in place to alert patrons of a wet floor. Children's own witnesses—Hrobak and Siedschlag— testified that if Parker was not using the scrubbing machine that morning, there was no reason for him to put up those warning signs. Fertal went further, opining that it would have been improper for Parker to erect those warning signs (as he claimed to have done) unless he had in fact used the floor scrubbing machine, or expected to use it imminently. And Parker, in his telling, never used the scrubbing machine on the fourth floor that day, despite the fact that his shift did not end until 3:30 p.m., raising the obvious question of why he would have put up warning signs and then somehow failed over the next 6.5 hours to do what he had set out to.

Ntsomi's email was also powerful evidence in Greene's favor. That email made clear that Ntsomi talked to a nurse shortly after Greene's fall, and that nurse reported that Parker had in fact used the scrubbing machine on the fourth floor that morning. Ntsomi's email further undermined Parker's account because it made very clear that he spoke with Parker on the day of the fall, something that Parker later

denied. Children's argues that Ntsomi's email was inadmissible hearsay, but we doubt that is true, because both Ntsomi and the nurse are clearly Children's agents, so that these statements would likely be treated as non-hearsay statements of an opposing party. *See* Fed. R. Evid. 801(d)(2); *Nunnally v. Graham*, 56 A.3d 130, 136 (D.C. 2012) (explaining that "this court has adopted" Rule 801(d)(2)). Children's might have an argument that it is not clear that the nurse was speaking from direct observation, as opposed to relaying third-party hearsay from an unidentified speaker, but that raises an evidentiary question for the trial court to address in the first instance. We do not think the record before us makes it at all clear that the nurse herself was relaying third-party hearsay, as nothing on the face of Ntsomi's email suggests that.

The trial court nonetheless treated Ntsomi's email as if it "corroborated" Parker's denials that he used the scrubbing machine, because Ntsomi recounts that on the day in question Parker denied using the machine in the particular area where Greene fell. We can set aside whether Parker's day-of denials would have been admissible,[1] because it is enough to say that a jury simply might not have believed

---

[1] Unlike Ntsomi's emails, these were not statements of an opposing party, but of the party seeking to rely on them. Children's may argue that Parker's day-of denial was admissible as a prior consistent statement, or that it should be admitted under the rule of completeness. Those are questions of admissibility that the trial

them. Notice the difference between Parker's testimony and what Ntsomi recounts: Parker's testimony is that he did not use the scrubbing machine at all on the day in the question, whereas Ntsomi recounts his contemporaneous report as the far more modest claim that he had not used it "by the area where the fall occur[ed]." One might reasonably infer from the contemporaneous statement that Parker admitted he used the machine elsewhere on the fourth floor, contrary to his later testimony, but simply sought to distance himself from the particular spot where Greene fell.

More importantly, the trial court's emphasis on Parker's repeated denials—it stressed that Parker repeated his denials "at least five times" as strong evidence in Children's favor—was misplaced. Repetition is no indication of veracity. *Wilson v. United States*, 266 A.3d 228, 240 (D.C. 2022) ("Prior consistent statements are generally inadmissible because 'mere repetition does not imply veracity.'" (quoting *Mason v. United States*, 53 A.3d 1084, 1090 (D.C. 2012))). And a jury is not required to credit Parker's evidently self-serving denials no matter how many times he has reiterated them. If we take Greene's claims as true, and Parker had indeed used the floor scrubbing machine where she fell without erecting the requisite wet

---

court has never addressed—and it is not obvious that Parker's day-of denial would be admissible on either basis—so we do not opine on them now.

floor signs, then he would have had a motive to fabricate from the moment he learned of his error.

Children's offers a handful of additional reasons why it believes a jury would have to speculate to rule in Greene's favor, but none are persuasive. Namely, it points to a lack of specifics in Greene's testimony, including that (a) she could not identify the liquid she slipped in; (b) she did not specifically testify to a contiguous trail of liquid connecting the area where she fell to the nearby scrubbing machine; (c) she did not specifically see the machine's brushes down; (d) she did not claim to hear the floor scrubbing machine go by J.G.'s room in the minutes before her fall despite it "being as loud as a vacuum cleaner"; and (e) no witness saw the floor scrubber in the exact place where Greene fell.

All of those points go to the weight of the evidence, and a jury could reasonably attach very little weight to them, both individually and in the aggregate. The first three points are not points against Greene at all: (a) Greene in fact testified that she saw "water, streaks of water on the floor," which was consistent with Children's own evidence that "[w]ith these machines, only water is used to clean the floors"; (b) Greene testified to seeing the streaks across the fourth floor, both where she fell and behind the nearby scrubbing machine, and her failure to say the water was "contiguous" does not seem relevant; and (c) we doubt many people would

notice the particular placement of a scrubbing machine's brushes, particularly after a serious fall, so that this detail is of no more than marginal relevance. On the fourth point, (d) it seems very understandable that a person visiting their grandson in the hospital would not take note of all of the hospital's ambient noise, so that is hardly a death knell for Greene's claim.

On the fifth and final point, (e) there was also no witness (aside from Parker) who specifically claimed that the scrubbing machine did not go by right where Greene fell, and a jury may simply choose to discredit Parker's testimony in light of the surrounding circumstantial evidence. Where the cause of an accident "cannot be established by direct proof, then the facts which can be established circumstantially may justify an inference by the jury that negligent conditions produced the injury." *Speights v. 800 Water St., Inc.*, 4 A.3d 471, 475 (D.C. 2010) (quoting *McCoy v. Quadrangle Dev. Corp.*, 470 A.2d 1256, 1259 (D.C. 1983)); *see also Janifer v. Jandebeur*, 551 A.2d 1351, 1352 (D.C. 1989) ("[A] party may satisfy its burden of production by offering circumstantial evidence."); *Holbrook v. District of Columbia*, 259 A.3d 78, 93 (D.C. 2021) (Plaintiffs do "not need to produce a smoking gun," it is enough for them to "offer circumstantial evidence that could reasonably support" a verdict in their favor. (quoting *Bryant v. District of Columbia*, 102 A.3d 264, 269 (D.C. 2014))).

Children's also places heavy reliance on two cases that it asserts compel affirmance here. The first case is *Marinopoliski v. Irish*, 445 A.2d 339 (D.C. 1982), which concerned a contractor who slipped and fell on a piece of plywood that was covered by several inches of snow on private property. *Id.* at 339-40. There was no argument that the landowners created that hazardous condition; the only question was whether they were on notice of it. We upheld a directed verdict for the landowners, concluding that there was not "sufficient evidence in the record that [the landowners] knew or should have known either that the plywood lay on the path or that it might fall onto the path" from where it had rested, on a nearby air conditioning unit. *Id.* at 340. By now, the material distinction between that case and this one should be evident to the reader: in this case, unlike *Marinopoliski*, there was evidence from which a jury could conclude that Children's own employee created the hazardous condition, thereby putting it on constructive notice of the hazard.

The next case is *Mixon v. Wash. Metro. Area Transit Auth.*, 959 A.2d 55 (D.C. 2008), which is similarly of no help to Children's. In *Mixon*, a patron slipped and fell on some stairs leading to a Metro station, and he sued the transit authority, WMATA. *Id.* at 56-57. While he alleged in his complaint that "WMATA employees left grease or oil on the station stairs," he admitted in his deposition that "he had no idea what the supposed substance was, how long it had been on the stairway, or how it got there, and that he did not see it before, during, or after his

fall." *Id.* at 59. There was also an eyewitness to the fall who testified that he "did not notice any foreign substance on the stairs" that might have led to Mixon's stumble. *Id.* We affirmed the grant of summary judgment in WMATA's favor, explaining that "[e]ven if we assume that appellant slipped on some kind of substance, there was no evidence whatever to prove that WMATA was responsible in any way for its being on the stairs, and thus no evidence that any negligence by WMATA caused appellant's injuries." *Id.*

The record here is in stark contrast to *Mixon*: (1) Greene saw the substance she slipped on and could roughly describe it as streaks of water; (2) she saw Parker on a nearby floor scrubber leaving the same streaks of water around him; (3) she presented expert testimony that the streaks of water she fell on most likely came from a floor scrubber; (4) Ntsomi's email provided corroboration from a nurse that Parker had used the floor scrubber on the floor shortly before Greene's fall; (5) another Children's employee contemporaneously asked where the signs "that should have been on the floor" were; and (6) Parker's own testimony that he put wet floor signs in place provided an inference that he had in fact used the floor scrubber in that area, given that there was no reason to erect those signs if he were only dust mopping, as he claimed. It simply cannot be said that there was "no evidence that any negligence" by Children's employees caused Greene's injuries, as was the case in *Mixon*. *Mixon* would look far more like this case if the plaintiff in that case had

seen and described the substance he slipped on as grease-like, had noticed nearby WMATA repairman working on an escalator with the same substance splattered nearby, had an expert testify that the substance in question sounded very much like what is typically used in escalator repairs, and had contemporaneous reports from WMATA employees that the escalator was in fact under repair that morning (despite the particular repairman's denials).  If that had been the record, summary judgment might well have been inappropriate in *Mixon*, just as it is here.

In this case, there was plenty of evidence from which a reasonable jury could conclude that Greene slipped and fell on liquid negligently left behind by Parker, without adequate warning signs, when he used the ride-on floor scrubbing machine on the fourth floor just prior to Greene's fall.

### III. Conclusion

For the foregoing reasons, we reverse the grant of summary judgment, and remand for the case to proceed to trial.

*So ordered.*